No. 32,880

E. E. FRIZELL, *Appellant,* v. GEORGE W. BINDLEY et al., *Appellees,* and EDWINA B. MOFFET, as Executrix and Devisee under the Last Will and Testament of A. H. Moffet, Deceased, *Appellant.*

(58 P. 2d 95)

Opinion filed June 6, 1936.

*Roscoe E. Peterson,* of Larned, and *R. C. Russell,* of Great Bend, for the appellant.

*W. H. Vernon, J. S. Vernon, Vincent G. Fleming, H. S. Rogers, Richard H. Browne, George W. Finney, Maurice A. Wildgen,* all of Larned, *Warren H. White, A. C. Malloy, R. C. Davis,* all of Hutchinson, *A. L. Moffet,* of Kinsley, *George S. Allen* and *Otis S. Allen,* both of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This action was begun in the district court of Pawnee county to determine the rights of certain riparian landowners to the use of the water in Pawnee creek for purposes of irrigation.

Pawnee creek is a natural watercourse which arises in Finney county, flows northeast through Hodgeman and Ness counties, enters Pawnee county and flows eastward for two thirds of the distance across that county and empties into the Arkansas river near the city of Larned. In Pawnee county this stream runs through a valley about three miles wide, of unusual fertility and well suited to agriculture when the limited rainfall is supplemented by irrigation.

In the last quarter of a century a number of riparian landowners in Pawnee county have gone into irrigation extensively. In seasons of normal rains there has usually been sufficient water in Pawnee creek and in the many springs which feed it to supply all persons presently engaged in irrigating their lands, so far as disclosed by this record. In recent years there has been a succession of dry seasons, with the consequence that there has been an occasional shortage of water for irrigation.

The most extensive irrigator, and one of the earliest in the Pawnee valley, is the plaintiff, E. E. Frizell. He owns 1,920 acres thereabout. About 1911 he began to irrigate part of his land. He constructed a dam and pumping plant and as the years passed he gradually brought 1,000 acres under irrigation. In 1911 and in 1917 plaintiff filed and registered successive appropriations of the water in Pawnee creek for irrigation purposes, in conformity with the statute of 1886 and its later amendments. (R. S. 42-101 et seq.)

The late A. H. Moffet, who was made a defendant in this action, (Edwina B. Moffet, substituted) was also an extensive irrigator (500 acres) in the Pawnee valley. He filed and registered appropriations of the waters of Pawnee creek in 1913 and 1917 in conformity with the pertinent statute. His lands lie some miles upstream from those of plaintiff Frizell.

The other defendants are owners of lands on Pawnee creek upstream from Moffet and Frizell. They are all engaged in farming by irrigation, but less extensively than Moffet and Frizell, their respective irrigated acreages ranging from 12 acres to 350 acres. Of these defendants, Forrest Lear and Arthur Mullins are the successors in title and interest of one S. W. Milliken, who, in 1917 filed and registered under the statute an appropriation of the Pawnee creek waters for irrigating purposes. They now irrigate 130 acres.

Defendants J. C. Browne and L. A. Browne own a considerable acreage of lands in the Pawnee valley, 350 acres of which is under

irrigation. In 1917 they made three successive filings and registrations of water appropriations, and another in 1924.

Defendant Searcy and associates own Pawnee valley lands; they irrigate 50 acres, and have on record an appropriation of water by filing and registration dated in 1925.

The Mather heirs, defendants, who irrigate 80 acres in the valley, have a filing and registration of water appropriation made in 1911.

Defendant Bindley, who irrigates 15 acres, is the successor in title of a former owner who filed and registered an appropriation of the waters of Pawnee creek in 1917.

The other defendants, except Rex B. Lee, who are riparian proprietors and who use the waters of Pawnee creek for irrigation purposes, have not filed and registered any appropriations of water in conformity with the statute. All the defendants except Lee have dams in Pawnee creek, varying from 1 foot to 12½ feet in height and costing from $2,000 to $12,000 each. The Moffet dam cost $25,000 and the Frizell dam $43,000, and all have pumps of large capacity and power—1,000 g. p. m. to 6,000 g. p. m. Defendant Lee and his associates, who irrigate 12 acres, have no dam. Lee's pump, 1,000 g. p. m., is situated 30 feet from the creek bank and draws its water supply from the inexhaustible underflow and not from Pawnee creek.

Plaintiff's petition pleaded the pertinent facts, his alleged rights of precedence by virtue of his prior appropriation and extensive use of the waters of Pawnee creek, and his expensive dam and pump equipment used and necessary in his irrigation activities. He also alleged that the defendants were taking so much water for irrigation purposes from Pawnee creek in recent years that there was not enough left to irrigate his lands, that this resultant diminished flow compelled him to shut down his pumping plant at critical times in the crop-growing season; and that whatever rights defendants had to the waters of Pawnee creek for irrigation were junior and inferior to his right as first recorded and actual appropriator. He prayed for an adjudication of the relative rights of himself and defendants, that his right of priority be protected, and that he be accorded injunctive and other equitable relief against defendants.

Defendant A. H. Moffet filed an answer and cross petition in which he made common cause with plaintiff Frizell against the other defendants; he pleaded his filing and registration of appropriation of water precedent to that of most of the other defendants, and

prayed for an adjudication of his rights and for injunctive and other relief against his codefendants.

Separate answers, each containing a general denial, were filed by groups of defendants—by Lear and Mullen, by Bindley and associates, and by Beamer and some sixteen other defendants. Some of these answers pleaded specifically the precise dates of defendants' filings and registration of appropriations of water under the act of 1886 and its amendments. Practically all of defendants except Moffet, and excepting Lee and his associates, joined in a cross petition in which they alleged that they all and singly held title to their lands by U. S. land patents or by mesne conveyances from the original patentees, and that their lands had passed into private ownership prior to the enactment of the statute of 1886 (Laws 1886, ch. 115; R. S. 42-101 et seq.), and that by virtue of their land patents and titles in fee simple, common law rights of riparian land ownership had attached and governed and protected their riparian lands in the Pawnee valley; and that such rights had become vested and unassailable as against the statute of 1886 and against any and all claim of right based upon that statute which, so far as applied to defendants, their lands and riparian rights, was void under the terms of the Kansas bill of rights and the Fourteenth Amendment.

The cause was tried by the court without a jury. Noncontroversial evidence was introduced and a mass of more or less pertinent facts was submitted by stipulation of counsel. The trial court made findings of fact extending to fifteen pages of the abstract, and these were followed by conclusions of law to some of which we must give space:

"1. That since all the real estate in this action passed from public ownership to private ownership prior to the enactment of the appropriation statutes, the plaintiff and defendant Moffet acquired no prior rights to the use of the water in the Pawnee creek, by virtue of their filing under the appropriation statutes, and they are not entitled to this relief.

"2. That the plaintiff and each of the defendants are entitled to use the water in Pawnee creek for domestic purposes, watering of livestock, and a reasonable amount for irrigation purposes.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"3. That a few times during the dry seasons in the past the defendants have used more than a reasonable amount of water for irrigation purposes, considering all the circumstances of the case and the amount of water flowing in the Pawnee creek in Pawnee county. [Italics ours.]

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"4. That although the court has denied the claim of the plaintiff and the

defendant Moffet under the appropriation statutes, they are entitled under their pleadings to a decree of court protecting their right to receive the surface flow of the Pawnee as defined in conclusion number two above. . . ."

The trial court then proceeded to render an opinion as follows:

"5. What is a reasonable use for irrigation purposes at all times and under all circumstances as they exist in Pawnee county, Kansas, along the Pawnee creek? What decree may the court make that will be of any practical benefit and guide to the irrigation commissioner in carrying out the decree of this court? Counsel for the plaintiff say that this is no easy matter for the court to determine, and the court agrees. Counsel for the defendants say that it is impossible and after reading every citation that the court has been able to find after an exhaustive search, . . . the court cannot pass this matter on to the irrigation commissioner. One example will be sufficient proof of this. The irrigation commissioner might decide that the water should be divided among the parties in proportion to the amount of land under irrigation; while the court might take the view that the water should be divided among the parties in proportion to the number of riparian acres owned by each user, regardless of the amount under irrigation by each user.

"The court will permit the introduction of further evidence, if desired, on the question of reasonable use, and further discussion of the matter."

Thereafter the chief engineer of the division of water resources of the state board of agriculture was called as a witness. He gave testimony touching the irrigation projects in the Pawnee valley in which these litigants were concerned; also about the flow of water in Pawnee creek and the desirability of irrigation to supplement the occasional shortage of rainfall of that locality. The record reads:

"Q. Mr. Knapp, I will ask you to state from your experience and observation, and from your knowledge of conditions in the Pawnee valley generally, if a decree could be entered in this case apportioning the use of water for the purpose of irrigation among the various interested parties in this action, without regard to any rights of priority; what the practical effect of such a decree would be?

"A. . . . Before I could answer a question of that kind with any certainty I would almost have to know what the proposed decree was, or what the provision of the proposed decree was. Of course I could make some general statements.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. If a decree were entered dividing the water, or rotating it among all the parties in this case, on some equal basis, such as so many acre-feet per acre of irrigated land, all of the parties of course would secure approximately equal amounts of water. The question that would enter my mind, if I am permitted to state it, would be the application of the decree as among people along the stream that had built irrigation projects. I have in mind the fact that in its irrigation development the valley is young, as I believe I testified on the former hearing, the average annual flow of the Pawnee since official

records are available, is about 24,000 acre-feet per annum; varying from a minimum of around 8,000 acre-feet to a maximum of about 32,000. There is, according to the best of my opinion, about 2,400 acres irrigated by the parties to this action, plaintiff and defendants. They have been diverting about one acre-foot per acre; in other words, approximately ten percent of the total annual flow of the stream is used; although all of them, both plaintiff and defendants, experience a shortage of water. If, let me add, there is, at the same time, a small part of the riparian land along the stream now irrigated, I don't know what proportion, but I don't believe I should be far off if I would say ten percent of the riparian land along the stream is now in irrigation. . . . The question that we might have then, about any decree of that kind, is just what would happen to both the plaintiff and the defendants in this action as more land is irrigated, if it were necessary to continue to subdivide this water between more and more people. The ultimate effect might be that none of them would succeed in getting water enough to make it worth while maintaining irrigation enterprises.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. If the decree stated what the reasonable use was, or specified reasonable use, then the enforcement officer could divide the water in accordance with that decree.

"Q. My question was, whether the decree did not so specify but simply provided for a reasonable amount.

"A. I doubt if that could.be done, unless the court places on the responsibility of the enforcement officer the duty of determining what is a reasonable use. . . ."

At this point the court took a hand in the examination of the officer:

"By the Court: Q. Have you anything further to say, Mr. Knapp, whether you have been asked by counsel or not? A. I really don't know, your Honor, just what information a witness should volunteer.

"Q. Volunteer anything. A. Out in western Kansas we are administering court decrees, and distributing the water to the various appropriators in accordance with those decrees, but those decrees are definitely set up, the manner in which those appropriators are entitled to the water, so it is purely an administrative one; it does not devolve on us to divide the rights, or the apportioning.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Although each man had the same number of acres of riparian land, same potential difference, would that be reasonable, fair and just? The man sitting here with ten acres of riparian land, why isn't he entitled to as much as the man who has eighty acres?

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. From one standpoint that might be called reasonable and equal use, and from another standpoint it certainly would not; because one land owner may never care to engage in irrigation at all, or his land might not be as suited for irrigation, and that might be equivalent to depriving better land and other landowners from making the best possible use of the—source of wealth.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. There is a further thing that I might add in connection with that, which I don't believe has been brought out: The state of affairs on a stream like the Pawnee has now been reached, where future development, that is, the development of this additional 21,000 or 22,000 acre-feet per year is going to depend on rather heavy storage; that is, most of that water comes down in great floods, very much beyond the capacity of all the pumping plants, or even the storage capacity of the lower channel; let's say the channel in Pawnee county, even though dams enough were built in the Pawnee valley to store. We have the time when that channel runs full, or to only bank full for several days. The time is reached when, afterward to develop irrigation in the Pawnee valley to its ultimate capacity, it is going to require relatively heavy storage on the tributaries above; that is, something in the nature of lakes, let's call it. An important question raised there is whether or not landowners can secure any right to water under which they could afford to invest in large storage projects, costing great amounts of money. Let's say, let's presume that all the water users in Pawnee county desired to organize this into an irrigation district or water improvement district, raising funds through the use of bonds, or through federal grants and loans, go up above and build some relative large storage to store these flood waters that now only go to waste; if that were done we could increase this irrigation by four or five times, and provide an even better water supply for all these users. But before such bonds would be salable, or before the federal government would invest money in that, undoubtedly the water users would have to show they had some title to that water, and that we would not have the situation where soon after that reservoir is built, some others would go up above it and build a —— or large reservoirs that would entirely deprive this other reservoir of its water. I don't know how, your Honor, these things could be incorporated in the decree, but they are the practical things that affect the ultimate development of the Pawnee, and in my judgment, they are questions as pertinent to the defendants in this case as the plaintiffs, because all of them are relatively young in the development of the valley. Whether it would be possible to enter a decree permitting each one of these to take water up to a certain amount, and at the same time restrict the newer users to a status subordinate to the present users, I do not know."

To summarize the further testimony of this officer, he could suggest no method by which the court could apportion the waters of the Pawnee creek between the riparian owners without applying the statute of 1886 and thereby doing violence to the common-law rights of the parties concerned.

The trial court eventually reached this conclusion:

"From the evidence it is not practicable to render any judgment or decree in said cause granting any relief to the plaintiff and the defendant, A. H. Moffet, or either of them, without recognizing the doctrine of prior appropriation of water.

"It is therefore by the court considered, ordered and adjudged, That . . . the plaintiff and defendant, A. H. Moffet, take nothing herein and that the de-

fendants, other than A. H. Moffet, have judgment against said plaintiff and the defendant, A. H. Moffet, for the costs of this action."

Plaintiff Frizell and defendant Moffet appeal, insisting on their rights as prior appropriators under the statute of 1886 and its amendments. The gist of that statute is expressed in its first section, which reads:

"The right to the use of running water flowing in a river or stream in this state, for the purposes of irrigation, may be acquired by appropriation. As between appropriators, the one first in time is the first in right." (R. S. 42-101.)

By 1886, however, all the lands of the Pawnee valley of present concern had passed out of the public domain into private ownership under United States land patents or by mesne conveyances from the original patentees. As riparian owners, therefore, their rights in and to the waters of Pawnee creek were dependent on whatever was the law of this state at the time their lands passed into private ownership. Those rights were such as attached to riparian lands at common law. (*Clark v. Allaman,* 71 Kan. 206, 80 Pac. 571, and citations.)

At common law a riparian landowner was entitled to use what he required of the water in a flowing stream to supply his household and to water his livestock. He could also harness the flowing water, but he could not divert it, nor could he long detain it. He was bound to permit it to flow on (*ut currere solebat*) so that it would serve the similar needs of lower riparian landowners. In our early case of *Shamleffer v. Peerless Mill Company,* 18 Kan. 24, 33, it was said:

"As incident to part of the realty at the time of this conveyance, was the right to the entire flow of the Neosho river through its natural channel 'without diminution or alteration.' This, with all other heriditaments, corporeal and incorporeal, passed with a conveyance of the land. 'The right to the use of the flow of the water in its natural course, and to the momentum of its fall, on the land of the proprietor, is not what is called an easement, because it is inseparably connected with, and inherent in, the property in the land; it is a parcel of the inheritance, and passes with it.' Angell on Watercourses, pp. 96, 97. In *Johnson v. Jordan,* 2 Met. 239, Chief Justice Shaw says of this right: 'It is inseparably annexed to the soil, and passes with it, not as an easement, nor as appurtenance, but as a parcel. Use does not create it, and disuse cannot destroy or suspend it.' See, also, *Tillotson v. Smith,* 32 New Hampshire, 90; 3 Kent Com., side page 402."

There has been no departure from this rule of law by this court, and it was virtually reiterated and applied to our recent case of

*Durkee v. Bourbon County Comm'rs,* 142 Kan. 690, 51 P. 2d 984. That the quotation just made is a fair statement of the common law, see Angell on Watercourses, 6th ed., 96 *et seq.*; Gould on Waters, 3d ed., § 204 *et seq.*; 3 Kent's Commentaries, 14th ed., 428, 429; 1 Kinney on Irrigation and Water Rights, 2d ed., § 543; Pomeroy's Law of Water Rights, rev. ed., § 138 *et seq.*; 67 C. J. 695-696, 700-701, 1287-1289, 27 R. C. L. 1081 *et seq.* In Tiffany on Real Property, 2d ed., 1131-1134, it is said:

"Though the water of a natural watercourse is not the subject of private ownership, each riparian owner has certain rights, and is subject to certain obligations, in regard to the use thereof, which may be summarized in general terms by the statement that, on the one hand, he is entitled to have the water flow as it has been accustomed to flow, and, on the other hand, since the other proprietors have the same right, he cannot himself interfere with such flow to any material extent. It is with reference to this general rule that the specific rights of the riparian proprietors as among themselves have been formulated by judicial decisions.

. . . . . . . . . . . . . . .

"The right of a riparian owner to appropriate water flowing past his land is, in general, limited to its use for such purposes, to such an extent, and in such a way as will not be inconsistent with a similar use by owners of other land lower down the stream, lower 'riparian proprietors,' as they are usually called. His right to apropriate the water for his domestic use, and also for the watering of his cattle, is not, however, according to the great weight of authority, limited by considerations of the necessities of lower proprietors, and he may use the water for these 'ordinary' purposes, even though the effect be to exhaust the supply. On the other hand, his right to appropriate the water of the stream for what are considered 'extraordinary' uses, such as manufacturing and irrigation, is restricted by the requirement that such appropriation must not so diminish the flow of water as materially to injure other proprietors lower down the stream, or as the same idea is otherwise expressed, his use of the water must not be unreasonable, having regard to a like use by the lower proprietors."

And since the common-law rule is that riparian rights are incidents of the land itself, quite different from easements which may be lost through non-user (27 R. C. L. 1081), those rights, so far as concerns the present litigants, were vested prior to the statute of 1886 and unaffected thereby. In 1886 there was—and this court takes judicial cognizance of the fact—a large amount of land in western Kansas which was still a part of the public domain, to which no private rights of proprietorship had attached. We are not now called on to decide whether the statute of 1886 is valid as applied to such lands afterwards patented or not. In *Clark v. Allaman,*

supra, that possibility was recognized. Paragraph 9 of the syllabus reads:

"The doctrine of prior appropriation may exist in the same state with the common-law doctrine of riparian rights."

But where they do coexist it must be by valid legislation, not by judicial decree. In *Feldhut v. Brummitt,* 96 Kan. 127, 150 Pac. 549, there was a question whether recorded but unconstructed rights of way for irrigation ditches were encumbrances affecting the title to land. It was there said:

"We are urged to apply this [arid states'] doctrine to irrigation ditches in this state. If this is to be done, it must be on the basis that the irrigation ditch is plainly observable to inspection; and could not be placed on the basis chiefly argued by appellant. He would put it on the ground that irrigation is necessary in western Kansas, and that we should adopt the Idaho doctrine. We could not do that. The situation in our state is peculiar. In eastern Kansas the Idaho or arid states' doctrine would be entirely inappropriate; in central Kansas it would be of doubtful propriety; in the extreme parts of western Kansas it might do very well; but no court has power to divide this state, like all Gaul, into three parts, and impose a peculiar doctrine upon our western frontier." (p. 129.)

While American jurists are ever ready to acknowledge that our heritage of the common law is of English origin, the English law books have virtually nothing to say on the subject of irrigation (1 Cooley's Blackstone, 3d ed., Book II, p. 18) for the reason that irrigation in that country is negligible, on account of its moist climate and abundant rainfall. But of course the growth of the common law was not halted when it came across the sea; and American courts have not hesitated to declare that, subject to its primary uses of *lavandum* and *potandum,* the use of water of a flowing stream for irrigation is one of the common-law rights of a riparian proprietor. But such right is not one which could be acquired by prior appropriation at common-law. It is limited by the equal right of every other riparian owner along the course of the stream to irrigate his lands therefrom; and no prescriptive rights to water for irrigation purposes can be acquired by one riparian landowner to the detriment of other riparian landowners. (*Clark v. Allaman,* supra, syl. ¶¶ 10, 11, 14.) At the instance of a lower riparian owner the courts will grant injunctive relief against an upper riparian owner who diverts or wastes the water of a flowing stream. (*Campbell v. Grimes,* 62 Kan. 503, 64 Pac. 62.) And obviously injunctive redress may likewise be awarded to a lower riparian owner against an upper riparian

owner who appropriates more than a fair share of the limited supply of water for irrigation purposes, not because of precedent right thereto, but because of his common-law right to an equal share of whatever water remains in the stream after the paramount right to the water for domestic uses has been served.

How do these general observations apply to this lawsuit? The trial court found that for irrigation purposes defendants had occasionally used more than their just share of the waters of Pawnee creek. That condition could have been corrected at the particular times; but there was no such condition at the time this cause was decided, and no error can be predicated on the court's refusal to grant an injunction against a grievance which had ceased to exist. (*State v. Order of Eagles*, 98 Kan. 793, 795, 161 Pac. 903.)

Appellants urge this court to discover and declare some adequate rule of law which will control and govern the respective rights of these litigants, taking into account their highly extensive investments in their important and useful irrigation projects in the Pawnee valley. We do not discover in the record any basis for any other judgment than that entered by the trial court. Even the officer of the state board of agriculture, presumably an expert (R. S. 1933 Supp. 74-509b *et seq.*) testified that he could not advise the trial court how the water should be apportioned among these litigants. A court must be furnished with evidential facts upon which an affirmative judgment can be predicated. After all is said and done, a plaintiff is only entitled to win his lawsuit where he establishes his alleged cause of action against his adversary. Where he fails to do this, his adversary is ordinarily entitled to judgment, not because of any superior right or virtue on his part, but because of the failure of plaintiff to establish his cause of action.

This case has had our assiduous and protracted consideration, for we are well aware of its importance; and we conclude that under all the circumstances the wisest decision we can now make is to follow the precedent made by the supreme court of the United States in *Kansas v. Colorado*, 206 U. S. 46, 51 L. Ed. 956, where the relief prayed for by the state of Kansas against the state of Colorado was denied for the time being without prejudice to its right to institute new proceedings if and when it could show that upper riparian landowners in Colorado were substantially depleting the waters of the Arkansas river to the prejudice of the state of Kansas and the lower riparian proprietors.

This cause is remanded to the district court with instructions to modify its decree by including therein a provision that the judgment is without prejudice to the right of plaintiff and defendant Moffet to institute new proceedings whenever it shall appear that any of the other defendants are taking more than a just share of the waters of Pawnee creek to the prejudice of appellants Moffet and Frizell. As to defendant Lee and those exclusively affiliated with him, this judgment is affirmed without qualification.'

Remanded for modification.

HUTCHISON, J., dissenting.