No. 42,312

Don Williams, *Appellee*, v. The City of Wichita, Kansas, a Municipal Corporation, *Appellant*, and Layne Western Company.

(374 P. 2d 578)

Opinion filed September 17, 1962.

*Robt. B. Morton*, of Wichita, argued the cause, and *Fred W. Aley*, of Wichita, and *J. Rodney Stone*, of Newton, were with him on the briefs for Appellant, The City of Wichita, Kansas.

*Kenneth G. Speir*, of Newton, argued the cause, and *Vernon A. Stroberg*, *Herbert H. Sizemore* and *Richard F. Hrdlicka*, of Newton, were with him on the briefs for Appellee.

The opinion of the court was delivered by

Fatzer, J.: This action was commenced January 16, 1958, and was before this court as *Williams v. City of Wichita*, 184 Kan. 53, 334 P. 2d 353. No extended review of that opinion is necessary, and its place in the chronicle of events will appear in the following statement of the nature, facts and history of the action.

The action was brought for an injunction to prevent the city of Wichita from drilling and pumping a water well in the Wichita well-

field area, Harvey County, Kansas. The issue was subsequently enlarged to include a total of ten municipal water-supply wells. The case was tried by the district court and it found "each and all of the issues of fact and law in favor of the plaintiff and against the defendant, the City of Wichita." Judgment was rendered that the 1945 Water Appropriation Act of Kansas (G. S. 1949, 82a-701, *et seq.*, as amended), hereafter referred to as the Act, was unconstitutional and that the city be permanently enjoined from pumping its water wells, but in the event it appealed to the supreme court, the injunction should be suspended until the appeal was determined on its merits. The defendant, hereafter referred to as Wichita, timely appealed following the overruling of its motion for a new trial.

The petition alleged the plaintiff is the owner of land in Harvey County "in the vicinity of" a municipal water well then being drilled by Wichita through Layne Western Company, a drilling contractor (although named as a defendant, the latter did not appear in the proceedings below and is not a party to this appeal). It later developed from amended pleadings and from the evidence that well No. 47, the well initially singled out, was approximately one and a half miles from plaintiff's 80-acre tract of land, and was one of a group of ten wells being drilled by Wichita. The petition further alleged that Wichita, contending the Act was constitutional and valid, filed an application with the chief engineer of the Division of Water Resources of the State Board of Agriculture for an appropriator's permit to beneficially use the water from the ten wells in question. During oral argument counsel for plaintiff stated that since Wichita's application was prior in time, and if the Act were found to be valid, the chief engineer had no alternative but to grant the application, and Wichita should prevail.

In support of his claim for injunctive relief, plaintiff alleged that the pumping of the wells would divert subterranean water from under his land resulting in his irreparable injury, and that he had no remedy at law by which the damage could be adequately recovered. He further alleged that the Act was unconstitutional and invalid in that it violated Sections 1, 18 and 20 of the Bill of Rights and Art. 2, Sec. 16 of the Constitution of Kansas, and that it violated the Ninth and Fourteenth Amendments and Sec. 10 of Art. 1 of the Constitution of the United States, as hereafter more specifically noted. The prayer was that the defendant be permanently enjoined from drilling or completing the well or any other wells until Wichita

acquired a lawful and valid right to drill said wells and divert waters from under the plaintiff's land and other land in the vicinity of the proposed well or wells.

Shortly after the petition was filed, Wichita, appearing specially, filed a motion to quash the summons, and later, as a part of its answer, challenged the jurisdiction of the court and demurred to the petition. Those defenses were denied, and Wichita has specified them as error. With respect to the merits, Wichita's answer was a general denial.

Wichita advances eighteen specifications of error; however, in oral argument counsel stated a willingness to abandon all specifications of error except those asserting that the district court erred in holding the Act unconstitutional and in granting judgment on the merits in favor of plaintiff. Such narrowing of the scope of the appeal is in keeping with the statement of plaintiff's counsel that the constitutionality of the Act is actually the single decisive issue of the case.

This court takes judicial notice of the many years of protracted litigation that has taken place in state and federal courts over Wichita's municipal well operations in the Equus Beds in Harvey County and is of the opinion that a ruling here on the constitutionality of the Act will have a settling effect on the general controversy which has too long kept ground water users throughout the state in uncertainty and confusion. The need of stability in the water laws of Kansas cannot be overstressed.

The position taken by Wichita is a withdrawal of questions concerning the validity of the service of summons and the amenability of a city to a suit of this nature in a county other than that where the defendant city is situated. Also, it makes it unnecessary to pass on the interesting question of whether a discussion which occurred in chambers between Wichita's counsel and the district judge constituted a general appearance, when the subject of the discussion was a temporary injunction that never became operative because of plaintiff's failure to post a statutory injunction bond as provided in G. S. 1949, 60-1110, and as ordered by this court (*Williams v. City of Wichita,* supra).

Before turning to the merits, a preliminary matter requires attention. The plaintiff filed a motion to dismiss or limit the scope of the appeal on the ground that the transcript of the evidence had not been filed with the clerk of the district court as required by

G. S. 1949, 60-3311. The parties conceded that the plaintiff obtained a copy of the transcript from the district court reporter at the same time it was furnished Wichita. Also, that the transcript was filed below prior to the hearing of the appeal and plaintiff's counsel stated during oral argument that no actual prejudice resulted. Under those circumstances, the motion is denied (*Hanson v. Kramer*, 131 Kan. 491, 292 Pac. 788).

With the issues joined, the parties stipulated that the first question to be decided was one of law, that is, the constitutionality and validity of the Act. Respective statements of the parties were filed and arguments were made following which the district court held that the Act was unconstitutional and invalid for the reasons and upon the grounds alleged by plaintiff, and that Wichita had no rights thereunder. The cause then proceeded to trial by the court upon the pleadings for injunctive relief.

In his opening statement the plaintiff enlarged the issues. Although no substantial change in plaintiff's theory of the case was advanced in his supplemental petition and in his opening statement, he asserted that because of the pumping of the Wichita wells, he has sustained damages, both from the loss of productivity and diminution in the land value itself; however, that an action for the recovery of those damages was not adequate because of "the nonclaim statute as it affects cities; that it would require a multiplicity of claims and litigation not only in the past, present, but for all time in the future as long as the City (Wichita) would continue its operations; that by reason thereof an action for damages is not adequate and that an injunction therefor is the only proper and appropriate remedy."

The water source involved in this action is the Equus Beds, or more correctly described as pleistocene deposits. These beds are an underground water reservoir composed of extremely permeable sand, gravel, clay and silt, with a storage co-efficient of twenty percent, that is, a cubic foot of material contains one-fifth cubic foot of water. The beds are located primarily in the McPherson channel of the ancestral Smoky Hill River. They were formed when that channel was gouged out by water in the early stages of the glacial period, and during intervening glacial and interglacial periods it filled up with the soil mixture of which the beds are presently comprised. Generally speaking, they are bounded by Hutchinson on the west, Newton on the east, Wichita on the south,

and Lindsborg on the north (roughly, 25 miles east and west, and 55 miles north and south). They are recharged by rainfall and the Little Arkansas River is their natural spillway or drain.

For information and convenience of the reader, on page 322 is a generalized geologic map of the Equus Beds, which designates the Wichita well-field area.

The essential features of the factual situation are clear. There was little conflict in the evidence. Most of the testimony was adduced by the plaintiff and he is, of course, bound by his own witnesses. Plaintiff has owned an eighty-acre tract in fee simple since 1955 by virtue of a deed from his father. Prior thereto, and since 1939, his father owned a life estate but agreed that plaintiff should conduct the farming operations. Plaintiff's opinion was that prior to 1952 the land was worth $300 per acre. In the fall of that year Wichita made application to the chief engineer of the Division of Water Resources pursuant to the Act (G. S. 1949, 82a-709), for an appropriation permit to drill and pump twenty municipal water supply wells, the one nearest the plaintiff's land (well No. 47) was to be located at a site about one and one-half miles distant. Although none of the wells were completed and equipped until 1958 (or actually pumped until the forepart of 1959) plaintiff considered that Wichita's 1952 application had the immediate effect of reducing the value of his land $100 per acre. That opinion was shared by plaintiff's expert witness on land value. Plaintiff and his expert witness were also in agreement that the actual drilling of the wells in 1958 caused an additional decrease of land value of $100 per acre. In terms of land productivity, plaintiff ascribed the lowering of the underlying water table as the cause of failure of his corn and alfalfa crops. In the case of alfalfa, he stated that the stands were gone by the year 1946 which, although many years prior to the Wichita wells which brought on this lawsuit, was subsequent to some twenty earlier wells, farther removed but in the same general area, which were placed in operation in 1940. Plaintiff's 1955 effort to irrigate corn and alfalfa was unsuccessful.

Plaintiff's witness, R. H. Hess, director of Wichita's water department, testified that in October of 1952 the city had filed an application with the chief engineer of the Division of Water Resources for an appropriation permit to drill and pump twenty new wells in Harvey County, ten of which were those complained of by plaintiff. Pumping of those ten wells was commenced in early Febru-

ary of 1959. All of the twenty wells for which application was made in 1952 were located upon tracts of land acquired by purchase from the landowner pursuant to a written, acknowledged instrument entitled "Indenture of Conveyance." Under the terms of that instrument Wichita acquired:

(a) A tract of land of five acres in square form;

(b) All of the existing and future water bearing sands and water rights in or under said tract;

(c) The right to use as much of the surface of the tract as is necessary or desirable to carry out the terms of the conveyance;

(d) The right in perpetuity to drill for, produce and transport subsurface water from the tract described;

(e) The specific right to extract subsurface water and to transport the same for such use and uses in the city of Wichita and its environs as the city may from time to time elect to make of it, specifically including further all of the subsurface water which may be stationary in and under the tract conveyed together with all water which may flow or percolate thereto from other lands; and

(f) The right in install and operate such pipelines, tanks and pump houses as are necessary or desirable for the handling and transportation of water extracted.

The foregoing rights were included in grantor's unrestricted warranty.

The most important part of plaintiff's evidence was the testimony of his expert witness, G. J. Stramel, whose qualifications were impressive. Now employed by Wichita's water department as a hydrologist, Stramel formerly was a hydrologic engineer with the United States Geological Survey from 1949 to 1956. During that time and in that capacity he made an intensive study of the Wichita well field in the Equus Beds area in Harvey and Sedgwick Counties. His study encompassed the geology of the water-bearing formation with particular attention to changes in the level of the water table and the artificial and natural causes of those changes. His findings were published in a bulletin, several maps and drawings, some of which were received in evidence as plaintiff's exhibits.

Mr. Stramel's testimony is summarized: Equus Bed ground waters are designated as percolating which means that they do not uniformly move in one direction at a constant rate. The waters may flow in any number of directions and are not confined to a definite channel. Their movement within the Wichita well field is about two to three feet a day. Their direction may be influenced and changed by the pumping of any well, which causes a gradient

to be created and waters flow toward the well bore. Thus is created what is known as a cone of depression which is deepest at the point of intake and spreads out. The area of the cone varies with the rate and volume of pumping and the amount of recharge into the formation.

If there is no pumping there is no room in the formation for new (recharge) water, in which event, new water would be discharged into the Little Arkansas River. Also, a large amount of ground water is lost by evapotranspiration—the natural utilization of water by plants from absorption in their root systems. The process is accelerated by hot weather and winds.

There are now a total of 138 wells in this area of the Equus Beds: 55 belong to Wichita, 18 to other municipalities, and 65 to various irrigators. All have the effect of creating cones of depression when pumped. Whether the continued pumping of the ten Wichita wells nearest plaintiff's land will further change the direction of flow and lower the water table depends principally upon rainfall. At present the recharge and discharge are about equal, and if rainfall stays the same, continued pumping will cause no change.

The current rate of Wichita's total pumping is approximately 30,000,000 gallons a day. The aggregate amount of water withdrawn from irrigation wells is roughly the equivalent of that taken from the Wichita wells. The latter are pumped in rotation to minimize the cones of depression. Nevertheless, the ten wells placed in service in early 1959 have clearly affected the direction of flow. It is not possible that any of the exact particles of water under plaintiff's land in early 1959 have been withdrawn through the nearest Wichita well.

From an observation well close by plaintiff's land which has been maintained since 1950 it has been determined that the water table reached a low of 11.38 feet below land surface in October of 1956. The severe drought which commenced in 1951 finally ended in the spring of 1957 and since then the rainfall has been normal or above. By December 1, 1958, the water table had risen to 5.31 feet below land surface. Since then it has declined 1.5 feet from the 1958 level so that now there is a net increase of 4.57 feet over the October 1956 low. In that drought period there would have been a decline of two to three feet in the level from purely natural causes without any pumping whatsoever.

This is the supreme court's first exposure to evidence of the actual conditions and characteristics of the Equus Beds formation and of facts concerning the extent and manner of withdrawals of waters therefrom. From that evidence emerges the salient and clear factual conclusion that these ground waters are percolating and hence migratory and fugitive. Any finding of the district court to the contrary is clearly not supported by the evidence. Thus, we are dealing with a right to *use* the underground waters as they pass through the owner's soil.

Throughout his brief plaintiff contends that being the owner of the underground waters lying under and in his land constituted a property right which was fully and completely vested long prior to the enactment of the 1945 Water Appropriations Act, and that such law, as applied, permitted Wichita to invade his property and to take it under the authority of the Act in violation of the Fourteenth Amendment and Section 18 of the Bill of Rights of the Kansas Constitution. In making the claim he asserts that the Equus Bed is actually an underground stream, with known limits, course, and direction, located in the "McPherson Channel." As we have seen, the assertion is not supported by the evidence.

The following are excerpts from plaintiff's brief asserting the basis of his claim of the unconstitutionality of the Act: That *State, ex rel., v. Knapp,* 167 Kan. 546, 207 P. 2d 440, which sustained the validity of the Act, did not rule on the critical section, namely, "G. S. 1949, 82a-702, which purportedly destroys all prior property rights in water and expropriates (by dedication to the use of the people of the state) vested property rights in water, and in the use thereof, under the long established law of the state, as set forth in the many decisions of this court and the many statutes"; that "the state cannot take appellees' property by legislative fiat, nor give it to another through the means of an administrative agency"; that "no legislature may constitutionally enact any law disturbing or destroying existing or vested rights, whether such rights be statutory or embodied in judgments or judicial decisions (16 A. C. J. S. 99, Constitutional Law, Sec. 417); nor may a legislature so impair an existing remedy so as to destroy or materially impair such vested rights . . . therefore, any law, regardless of alleged necessity, which attempts to impair or destroy a vested right is absolutely void"; that "Kansas has not only recognized the common-law doctrine of 'riparian rights' and ownership of underground water by

judicial decision and statute, but has *actively and aggressively insisted upon them* in its own behalf and on behalf of landowners of Kansas"; that "in view of such a history, there can be no question that *appellee's property rights were fully and completely vested long prior to 1945,* and were not subject to being disturbed or taken away by legislative fiat or any other process than 'due process of law'"; that "appellee respectfully submits that under the Kansas law, *both by statute and by decision,* his ownership and right to the use of waters of the Equus Beds and the rights of the landowners therein, had fully and completely vested long prior to 1945."

Before discussing the Act, we note again that plaintiff's evidence established the fact that the ground waters of the Equus Beds are percolating in character. Percolating waters have been judicially described as those which, "Ooze, seep or filter through the soil beneath the surface without a defined channel." ( *Clinchfield Corp. v. Compton,* 148 Va. 437, 139 S. E. 308, 311.) See, also, Anno: 29 A. L. R. 2d 1357.

The contitution of Kansas contains no provision relating to the dedication, control, application or administration of either surface or underground waters, and the common law has been fundamental in this jurisdiction in determining rights of riparian and overlying owners.

In 1877 this court adopted the doctrine of riparian rights and first applied the "natural flow" rule to surface streams that "every man through whose land a stream of water runs is entitled to the flow of that stream without diminution or alteration" ( *Shamleffer v. Peerless Mill Company,* 18 Kan. 24). As a result of legislation first enacted in 1886, not necessary here to further identify, and a series of subsequent decisions ( *Clark v. Allaman,* 71 Kan. 206, 80 Pac. 571, 70 L. R. A. 971; *Railway Co. v. Shriver,* 101 Kan. 257, 166 Pac. 519; *Heise v. Schulz,* 167 Kan. 34, 204 P. 2d 706), the "natural flow" rule was modified to the "reasonable use" doctrine for the "laudable purpose of encouraging irrigation."

Prior to 1945 this court adopted and applied the English or common-law rule that percolating ground water "belongs" to the owner of the land in which it is found. Only three Kansas decisions ( *City of Emporia v. Soden,* 25 Kan. 588, 37 Am. Rep. 265 [1881]; *Jobling v. Tuttle,* 75 Kan. 351, 360, 89 Pac. 699; *State, ex rel., v. Board of Agriculture,* 158 Kan. 603, 149 P. 2d 604) have dealt with the subject, but the "ownership" of the corpus of the water was not defined.

In the Soden case the appellee-landowner purchased the flowage rights of an upper riparian owner and at considerable expense impounded water by a dam across the Cottonwood River. Power therefrom was used to operate his mills. The city of Emporia dug a well some 75 to 100 feet from the banks of the pond. One pipe was sunk into the well and another extended directly into the pond. The well was used to supply the citizens of Emporia with their ordinary water needs and the pipe to the pond was intended to be used only in case of fire. The use of the well by the city in certain seasons of the year depleted the water in the pond to the extent that the power machinery would not operate and the owner was forced to suspend work. The court noted the distinction between appropriating by well or otherwise that which is merely underground and percolating water, and diverting from a natural stream by means of an adjacent well, and held that the latter could not be permitted. Syllabus ¶ 3 reads:

"While the general doctrine in respect to underground water percolating through the soil is, unquestionably, that the owner of the land may appropriate it to any use, and in any amount, and without reference to the effect of such appropriation upon his neighbor's land or supply of water, yet it is limited to this extent, that he may not thus indirectly destroy or diminish the flow of a natural surface stream to the injury of a riparian owner thereof."

In the opinion Mr. Justice Brewer stated:

". . . that as the water enters only by percolation through the soil, the law will permit no inquiry into the source of supply, of the effect of such percolation upon the quantity of water in any other tract of land. It is doubtless true, as a general proposition, that the law takes no cognizance of percolating water. The impossibility of proving with reasonable certainty the sources of supply, is a strong if not the principal reason therefor. But upon whatever founded, the doctrine may be considered settled. Chief Justice Chapman, in delivering the opinion of the court in the case of *Wilson v. New Bedford*, 108 Mass. 265, says: 'The percolating water belongs to the owner of the land as much as the land itself, or the rocks and stones in it; therefore he may dig a well, and make it very large, and draw up the water by machinery or otherwise, in such quantities as to supply aqueducts for a large neighborhood. He may thus take the water which would otherwise pass by natural percolation into his neighbor's land, and draw off the water which may come by natural percolation from his neighbor's land.' . . ." (1. c. 608.)

In support of the court's holding, Mr. Justice Brewer cited the English cases of *Acton v. Blundell*, 12 M. & W. 324, 152 Eng. Rep. 1223 [1843], and *Chasemore v. Richards*, 7 H. L. 349 [1859] which are generally regarded as the first reported underground water cases in the English speaking world.

The Jobling case is relatively unimportant so far as ground water law of this state is concerned. It did not involve any question of relative rights of neighboring landowners overlying a common ground water supply. Rather, it involved an oral agreement and a claim of prescriptive rights to the use of mineral spring waters in an overlying owner's land. The Soden case was cited with approval, and the common-law rule was reaffirmed, "That percolating waters, such as these springs are, belong to the owner of the land as much as the land itself, admits of no doubt."

In *State, ex rel., v. Board of Agriculture,* supra, the issue before the court did not directly involve ground water rights but instead was whether the then existing statutes gave authority to the Division of Water Resources and its chief engineer to regulate the taking of ground waters from the Equus Beds for beneficial uses and to allocate the same among existing users, and it was held:

"We have no statute which authorizes the Division of Water Resources of the State Board of Agriculture or its chief engineer to regulate, allocate or distribute, or otherwise interfere with the use and consumption of underground waters, or to conduct a hearing upon the application of anyone desiring to use such waters for the allocation, distribution or regulation thereof."

The opinion referred to many of our earlier cases pertaining to irrigation and the common-law rights of riparian owners and observed that there had been no departure from the basic principal that water rights were governed by the common law except as modified by statute; that underground waters were a part of the real property in which they are situated, and that the owner of land owns its surface and ground water by the same title as he owns the land itself. From the foregoing it may be said that the English or common-law rule was still the law in this state with respect to ground waters in 1945.

The foregoing rule announced in our cases was derived from a series of English cases of which *Acton v. Blundell,* supra, and *Chasemore v. Richards,* supra, are the most frequently cited. The essence of the English or common-law rule was that the owner of the surface might extract as much water as he wished from the underlying strata without liability (in the absence of malice) to adjoining owners for the interception and stoppage of the flow of the percolating waters to and in such adjoining tracts.

The confusion, if any, in our decisions that has resulted in the application of the common-law rule may be attributed to a lack of understanding of the meaning of the term "ownership" as ap-

plied to percolating waters. In *Acton v. Blundell,* supra, it was held that the owner of the surface might apply subterranean waters as he pleased and that any inconvenience to his neighbor from doing so was *damnum absque injuria.* Lord Chief Justice Tindal said:

". . . (The case) rather falls within that principle, which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it be solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure. . . ." (p. 354.)

However, the qualified sense in which such concept of ownership was actually regarded by the English Courts is found in the remarks of Lord Wensleydale in the Chasemore case, *supra.* Commenting on the opinion in *Acton v. Blundell,* supra, he stated:

". . . Surely the *use* of flowing water in each case (subterranean as well as surface), and *not the property in it,* belongs to the proprietor of the surface." (Emphasis supplied.) (p. 384.)

In the opinion Lord Wensleydale enunciated the principle as to percolating water in the following language:

". . . which gives to the owner of the soil all that lies beneath his surface . . . that the person who owns the surface may dig therein . . . and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbour's well, this inconvenience to his neighbour falls within the description of *damnum absque injuria,* which cannot become the ground of an action." (p. 377.)

In 93 C. J. S., Waters, § 90, p. 765, the rule is stated thus:

"There can be no ownership in seeping and percolating waters in the absolute sense, because of their wandering and migratory character, unless and until they are reduced to the actual possession and control of the person claiming them. Their ownership consists in the right of the owner of the land to capture, control, and possess them, to prevent their escape, if he can do so, from his land. . . . If percolating waters escape naturally to other lands, the title of the former owner is gone; while a landowner may prevent the escape of such waters from his land, if he can do so, yet he has no right to follow them into the lands of another and there capture, control, or reduce them to possession."

See, Anno: Subterranean and Percolating Waters, 55 A. L. R. 1385, 1390.

The common law concept of "absolute ownership" of percolating water while it is in one's land is an anomaly—while giving him the right to abstract from his land all the water he can find there, it affords him no protection against the acts of his neighbors who,

by pumping on their own land, manage to draw out of his land all the available water it contains. Much of the language in the cases pertaining to absolute ownership is *obiter dicta* and completely unnecessary to the respective decisions. Moreover, ownership as a concept is often vague and denotes only certain rights of use against certain persons with respect to certain physical phenomena. Thus the use of the term "ownership" as applied to percolating water has never meant that the overlying owner had a property or proprietary interest in the corpus of the water itself. This necessarily follows from the physical characteristics of percolating water. It is migratory in nature and is a part of the land only so long as it *is in it*. There is a right of use as it passes, but there is no ownership in the absolute sense. It belongs to the overlying owner in a limited sense, that is, he has the unqualified right to capture and control it in the quantity desired and with an immunity from liability to his neighbors for doing so. When it is reduced to his possession and control, it ceases to be percolating water and becomes his personal property. But if it flows or percolates from his land, he loses all right and interest in it the instant it passes beyond the boundaries of his property, and when it enters the land of his neighbor it belongs to him in the same limited sense ( *City of Emporia v. Soden*, supra; *Utah Copper Co. v. Stephen Hayes Estate, Inc., et al.*, 83 Utah 545, 31 P. 2d 624, *certiorari* denied 295 U. S. 742, 79 L. Ed. 1688, 55 S. Ct. 654; 1 Wiel, Water Rights in the Western States, Note 18, § 18; *Justesen v. Olsen et al.*, 86 Utah 158, 40 P. 2d 803; Scurlock, Constitutionality of Water Rights Regulation, 1 Kan. L. Rev. 298, 300, 301 ).

In *Wallace v. City of Winfield*, 98 Kan. 651, 159 Pac. 11, it was held that a riparian owner had no title to the corpus of the water in the river; that the water was not "his," and until he reduced it to his possession and exercised control and management over it, did he obtain a property right in it; that his right was to the *use* of the water—a property right of a usufructuary nature that "attached" to the riparian land; that as an incident of the land, the right of use accompanied a conveyance of the real property and since there was no ownership of the water, he could not recover the value of any such water wrongfully diverted.

The foregoing holding is, by analogy, applicable to ground waters which have not been reduced to the possession and control of the overlying owner. It would be the height of inconsistency to apply

the foregoing holding in the case of flowing stream waters and deny its like application in the case of percolating waters. Possession and control are as essential to one as to the other. See, *Wood v. Fowler*, 26 Kan. 682, 690, Syl. ¶ 3.

Hence, the true nature of the law of percolating water rights under the English or common-law rule as applied in the Soden case, and unreversed as of June 28, 1945, was that an owner had no legal right to complain of the diminishment of the subterranian water underlying his land through pumpage of wells by irrigators, municipalities and other water users in the area. Further, that such users had a corresponding right to utilize from their own land, all the water they desired and were capable of extracting without regard, in the absence of malice, to any resulting diminishment of the source of supply available to neighbors, irrigators, municipalities or other users of water. (*City of Emporia v. Soden*, supra, p. 608.)

The unsuitability of such a rule to modern day conditions was self-evident, and as a result of the decision in *State, ex rel., v. Board of Agriculture*, supra, decided June 10, 1944, the governor appointed a committee to study the various statutes and decisions and to formulate a new law to dispel the resulting inequities to individuals, the lack of control of wastage and the harmful effects the unmodified common law would produce to the economy of the state. The committee completed its work, and in December, 1944, made its report entitled "The Appropriation of Water for Beneficial Purposes," which was the basis for the enactment of the 1945 Water Appropriation Act.

Before discussing the features of the appropriation doctrine as it is embodied in the Act another point requires attention. This concerns the basic power of the legislature to modify and change common-law rules with respect to water usage. From the earliest days of Kansas history, flexibility in the common law has been carefully preserved (G. S. 1949, 77-109). Indeed, the great office of statutes is to remedy defects in the common law as they are developed and to adapt it to the changes of time and circumstances. That the legislature may change the principle of the common law and abrogate decisions made thereunder when in its opinion it is necessary to the public interest is well settled (*O'Neil v. North'n Colorado Irrigation Co.*, 242 U. S. 20, 26, 27, 61 L. Ed. 123, 37 S. Ct. 7; *Silver v. Silver*, 280 U. S. 117, 74 L. Ed. 221, 50 S. Ct. 57; *Komorowski v. Boston Store of Chicago*, 341 Ill. 126, 173 N. E. 189;

*Katz v. Walkinshaw,* 141 Cal. 116, 74 Pac. 766; *Power Co. v. Cement Co.,* 295 U. S. 142, 79 L. Ed. 1356, 55 S. Ct. 725; *U. S. v. Gerlach Live Stock Co.,* 339 U. S. 725, 94 L. Ed. 1231, 70 S. Ct. 955, 20 A. L. R. 2d 633; *State, ex rel., v. Knapp,* 167 Kan. 546, 207 P. 2d 440).

The committee report of December, 1944, included a synopsis of our statutes and decisions pertaining to water, irrigation, and the rights of riparian owners, and expressed the view that our law should be adjusted to present needs, from which we quote, in part:

"The Committee believes that conditions, and the needs of the people in Kansas, have changed so greatly since the early adoption of the common law as applied to water use, that the time has come to modify the common law to the extent necessary to set up a system of appropriation, based on priority of right, but without depriving the common-law owner of relief by proper compensation for limitations placed on unused common-law rights."

In *Baumann v. Smrha,* 145 F. Supp. 617, affirmed 352 U. S. 863, 1 L. Ed. 2d 73, 77 S. Ct. 96, the broad reach of state legislative power was positively stated as follows:

"The power of a state either to modify or reject the doctrine of riparian rights because unsuited to the conditions in the state and to put into force the doctrine of prior appropriation and application to beneficial use or of reasonable use has long been settled by the adjudicated cases." (p. 624.)

The inherent power to legislate being clear, we inquire if that power has been constitutionally exercised. The scope of that inquiry must conform to the issues presented by the record. As previously indicated, plaintiff principally contends that G. S. 1949, 82a-702 takes his property—the unused ground water in his land —by legislative fiat and gives it to another through the means of an administrative agency.

The committee which drafted the Act, and the legislature which adopted it, considered the problem of water use rights in the light of present day knowledge concerning the interrelationship of ground and surface water and approached it with the realities of hydrology and natural processes rather than an adherence to outmoded legal concepts. Foley, *Water and the Laws of Nature,* 5, Kan. L. Rev. 492 (1957), states:

". . . one cannot separate ground water and surface water. What is surface water at one time is ground water the next. What is ground water today becomes surface water tomorrow. Any concept dealing with all water must correlate ground water and surface water." (p. 497.)

That scientific premise is implicit in the Act. The Act makes no dis-

tinction whatsoever between ground water and surface waters but applies to both the principles and procedures which are recognized by the laws of the seventeen western states as the appropriation doctrine. See 1 Kinney (2d Ed.), Irrigation and Water Rights, § 587, pp. 1009-1011. Twelve of those states now have statutes applying the appropriation doctrine to percolating ground waters (Hutchins, Ground Water Legislation, 30 Rocky Mt. L. Rev. 416.)

The Act was entitled "An Act to conserve, protect, control and regulate the use, development, diversion and appropriation of water for beneficial and public purposes, and to prevent waste and unreasonable use of water. . . ." A detailed analysis of the Act is unnecessary since that was done in *State, ex rel., v. Knapp,* supra. All subsequent references to the Act found in G. S. 1949, 82a-701, *et seq.,* as amended, is to G. S. 1961 Supplement, unless otherwise designated. While it was amended in several particulars in 1957, the amendments treated of procedure, and did not affect the general scheme to establish the appropriation doctrine in Kansas, and to reduce the advantage of location of lands riparian to surface streams and overlying ground waters as against appropriations of water for beneficial use on nonriparian and nonoverlying lands. The general purport of the Act was stated in the committee's report as follows:

"The paramount purpose of the proposed act is to set up an orderly system of appropriation of water based upon the rule of priority of right. The Committee finds it would be necessary: (1) to determine, define and protect existing common law uses; (2) to place limitations upon unused common law rights as now recognized in this state and subordinate them to appropriation rights; (3) to allow a common law owner of unused water rights a means of recovery for such damages as he is able to prove he has suffered by an injury or impairment of his property or of any right to initiate a later use of water; (4) to deny injunctive relief to common-law owners who have not initiated any use of water or who have not begun the construction of any diversion works; (5) to authorize injunctive relief for the protection of an appropriator under the act as against a common-law owner who seeks to initiate a common law use after the effective date of this act; (6) to clothe a central state administrative agency with the authority to control the appropriation of water as directed by the act and in conformity with the legislation now in practical operation in many states; (7) to establish principles for appropriation and use of water with a view toward conservation of this natural resource for the greatest benefit of its people and to prevent waste of water by permitting its flow on toward the ocean."

It is evident that the legislature, in placing into effect the committee's recommendations, exercised the police power of the state in determining its policy that "All water within the state of Kansas

is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein provided" (G. S. 1949, 82a-702), and in providing that "Subject to vested rights, all waters within the state may be appropriated for beneficial use . . .," and that nothing in the Act "shall impair the vested right of any person except for nonuse" (G. S. 1949, 82a-703). This declaration makes it clear that Kansas has embarked upon a new approach to the problem of use of the water resources of the state. In passing the Act it is manifest that two major factors were uppermost in the minds of the legislators: First, that the doctrine of appropriation should be based upon the time of use and the actual application of water to beneficial use without regard to the ownership of land contiguous to the streams or the overlying lands, and Second, that unused water could not wisely be held in perpetuity for a common-law owner who may never have use for it, without resulting in underdevelopment permitting the water to flow out of the state and on toward the ocean, as an economic waste and loss of a valuable natural resource. To achieve that result, the doctrine of appropriation for beneficial use based upon the rule of priority of right (first in time is first in right) was established, and adequate administrative controls were provided to prevent overdevelopment of any source of supply with resulting injury to established uses.

The scheme of the Act was that vested rights of common-law users would be ascertained by the chief engineer of the Division of Water Resources (82a-704) based upon pre-1945 usage for beneficial purposes. When such water-use rights are determined, the Act recognizes a superior vested right of such users to continue their pre-1945 uses in the same amounts and at the same rate of diversion that were then in effect. Hence it may be said that the appropriation doctrine and the rule of priority of right were intended to apply only to such water as was not being beneficially used at the time of the passage of the Act, that is, to our undeveloped and consequently unused water resources. That is made clear by Sec. 82a-701 (d) which adopted the committee's recommendation that the "existing common-law uses" be determined, defined and protected. It is these recognized use rights that may not be taken or destroyed in the absence of due process of law.

The term "vested right" is defined in 82a-701 (d) and is the right of any person under a common-law or statutory claim to

continue the use of water having actually been applied to any beneficial use, including domestic use, on or within three years before June 28, 1945, or within a reasonable time thereafter by means of diversion works then under construction, to the extent of the maximum quantity and rate of diversion for the beneficial use made thereof, but such right does not include common-law claims such as the plaintiff asserts, where he has not applied water to any beneficial use within the period prescribed by the Act. The definition is premised upon the *beneficial use* of water and not upon *nonuse.* As the record indicates, the plaintiff does not base his claim of vested rights in ground water upon any application of such water to beneficial use. He neither alleged nor proved any water-use rights under the Act to any water in the Equus Beds. Hence, the term "vested rights" does not include unused common-law rights such as the plaintiff asserts. This is made clear by the Act which expressly excludes "those common law claims under which a person has not applied water of any beneficial use within the period of time set out in this subsection" (82a-701 (*d*)).

There are many procedural and other terms of the Act which implement the doctrine of appropriation. For the purpose of this case, however, it is not necessary that these be detailed. It is sufficient to say that while the Act denies injunctive relief to common-law claimants, such as the plaintiff here seeks, it affords protection to common-law owners who have not initiated any use of water for beneficial purposes by giving them a cause of action at law to recover due compensation against an "appropriator" for damages proved for any property taken (82a-716), or for any injury done to their lands or to any water rights appurtenant thereto (82a-721a). Likewise the act (82a-712, 716, 717 [a]) affords vested right owners and appropriation users injunctive relief against later common-law claimants of right to use stream or underground waters although a claimant may, of course, make application for an appropriation permit to apply water under his land for beneficial purposes (82a-709).

While no specific water-use rights were involved in *State, ex rel., v. Knapp,* supra, and none were adjudicated, the Act was sustained upon all questions submitted for determination, when challenged on the ground that the proposed diversion by the defendant irrigation district from the Republican River would infringe upon the rights of the owners of riparian lands lying in and downstream from the district. The chief engineer of the Division of Water Re-

sources had approved the irrigation district's application for a permit to divert and appropriate water from the river after notice and hearing. It was held that, among other things, the Act was not unconstitutional as a taking of pre-existing vested riparian rights of downstream owners; or as providing for the diversion of water to irrigate nonriparian lands against and without acquisition of the rights of lower riparian owners; or as requiring an owner of riparian lands to apply and obtain the approval of the Division of Water Resources for the use of water in order to preserve such rights, or as improperly conferring legislative or judicial power upon the chief engineer. Speaking through Mr. Chief Justice Harvey the court said:

"We next observe that no complaint is made of section 702, which declares: 'All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein provided.' This is the heart of the statute. The rest of it treats of details and procedure. It forms the basis for a different approach to the solution of questions concerning water rights than we have had in some of our opinions. Heretofore we have approached the questions largely on the basis of individual interest alone. Under this declaration and other provisions of the act we now approach them upon the basis of the interest of the people of the state without losing sight of the beneficial use the individual is making or has the right to make of the water. Unused or unusable rights predicated alone upon theory become of little if any importance. Broad statements found in some of our opinions, such as 'Every man through whose land a stream of water runs is entitled to the flow of that stream without diminution or alteration' (*Shamleffer v. Peerless Mill Company,* 18 Kan. 24), must be disregarded or modified to harmonize with this declaration. The change is an appropriate one for the legislature to make. Individuals do not live alone in isolated areas where they, at their will, can assert all of their individual rights without regard to the effect upon others." (1. c. 555.)

Under the legislative declaration of 82a-702 and other provisions of the Act, the beneficial use which the individual is making or has the right to make of the water is now the important phase of his water rights.

The case of *Baumann v. Smrha,* supra, decided April 30, 1956, affirmed by the Supreme Court of the United States on October 15, 1956, involved lands overlying the same Equus Beds. When the action was commenced there were some 225 water wells in the general area of the plaintiff's land withdrawing water from the Equus Beds which resulted in a "draw-down" of the water table under their lands. Twenty-five of the wells were owned and operated by Wichita to produce and supply water for the municipal

needs of that community. All of the wells were operated pursuant to either vested right determinations or appropriation permits of the chief engineer. The plaintiffs contended that the Act, and the vested right determinations and appropriation permits of the chief engineer, deprived them of property rights in violation of the due process clause of the Fourteenth Amendment.

A point strongly pressed by the plaintiffs was that the Act did not require that they be notified of the granting of an appropriation permit by the chief engineer, hence they were denied the opportunity of a hearing in opposition to the appropriation applications with which they were concerned. Answering the contention, Chief Judge Phillips said:

". . . permits are necessarily granted subject to valid existing vested rights and to prior appropriations, and provision for the protection of those rights, either by actions for damages or for injunction, is carefully made by Sections 82a-712 and 82a-716."

As previously indicated, the court unequivocally held that a state had the power to depart from the common-law doctrine of riparian rights and establish the doctrine of appropriation and application to beneficial use, and on that point it was said:

"[3] Of course, such a modification in the law of the state must recognize valid existing vested rights, but we do not regard a landowner as having a vested right in underground waters underlying his land which he has not appropriated and applied to beneficial use.

"[4] We hold that the state could properly apply the doctrine of prior appropriations and application to beneficial use to unused and unappropriated waters so long as it recognized and afforded protection to rights which landowners had acquired at the time of the effective date of the Act to appropriate and use water.

"Whether such a change in the law of Kansas is contrary to earlier decisions of the Supreme Court of Kansas, it is cognizant with the latest decisions of the Supreme Court of Kansas in State, ex rel. Emery v. Knapp, 167 Kan. 546, 207 P. 2d 440, which must be regarded as having overruled the earlier cases.

"[5] There is no vested right in the decisions of a court and a change of decision does not deprive one of equal protection of the laws or property without due process of law.

"[6] Even though prior decisions of a state court have established a rule of property, a departure therefrom in a subsequent decision does not, without more, constitute a deprivation of property without due process of law under the Fourteenth Amendment.

"[7, 8] The Fourteenth Amendment in guaranteeing equal protection of the laws does not assure uniformity of judicial decisions or immunity from judicial error. Likewise, it is well settled that a legislature may change the principle of the common law and abrogate decisions made thereunder when in the opinion of the legislature it is necessary in the public welfare.

"[9] Adequate water supply is a necessity. In the arid and semi-arid regions of the West it is imperative that all available water be utilized beneficially and without waste. The accomplishment of those ends is well within the competency of the legislature.

"Plaintiffs have not seen fit to invoke the remedies afforded them by the Act. Those remedies are adequate, we think, to afford protection to any vested rights of the plaintiffs.

"[10] We conclude that the Act is constitutional."

The notion that the surface owner is the owner of the underlying water greatly confounds the situation with respect to the power of the state to dedicate water to beneficial use and to regulate that use. As we have seen, under the common law the overlying owner does not have absolute title to the underground water that may permeate below the surface. He has the unqualified right to drill a well on his own land and take from the strata below all the water that he may be able to reduce to possession including that coming from land belonging to others, but the right to take and thus acquire ownership is subject to the power of the state to provide that it will be put to beneficial use and to prevent its unnecessary loss or waste, by requiring that the unused portion be made subject to the doctrine of appropriation.

The privilege of using water is unquestionably an element of the value of the land. To take away that right might be tantamount in a semi-arid country to confiscation of property. But the Act is not compulsory in its provisions. It does not compel or require a surface owner to obtain a permit in order to make use of the underlying water. Neither does it require that a permit be obtained for the installation of a well or pump or other works by means of which water can be diverted from its source to its place of use. However, such an owner, by electing not to come under the protection of the Act, is subject to the hazard of injunction in the event his usage impairs rights recognized and protected under the Act. To that extent, the plaintiff may presently drill wells to capture and divert underlying water and apply it to beneficial use without waste, subject, however, to the preferential use rights of a vested right user or the appropriation right of one who applies water from the same source to beneficial use (82a-712, 716, 717 [a]).

It is not for this court to decide matters of policy, nor, indeed, to weigh the beneficial results which may follow the adoption of any particular legislative policy (*Topeka Laundry Co. v. Court of Industrial Relations*, 119 Kan. 12, 237 Pac. 1041; *Quality Oil Co. v.*

*duPont & Co.,* 182 Kan. 488, 322 P. 2d 731; *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 364 P. 2d 71; *State v. Hill,* 189 Kan. 403, 369 P. 2d 365). It is our duty to declare the law as it exists. We are not responsible for its consequences. Regardless of the form of the underground water, the power of the legislature to establish a new basis for adjusting the privileges and rights of surface owners is vindicated by the same consideration as was involved in *State, ex rel., v. Knapp,* supra, which justified this court in sustaining the Act and abolishing the riparian doctrine in favor of the appropriation doctrine. What was said in Knapp which sustained the Act and substituted the appropriation doctrine for the riparian doctrine is equally applicable to the instant case. The difference is slight. There we were concerned with the privileges of adjacent owners and here with the privileges of surface owners. In either case, the privileges are amenable to reasonable regulation. We hold that it was within the competency of the legislature to define the "vested rights" of common-law water users, or to establish a rule as to when and under what conditions and to what extent a vested right should be deemed to be created in such a water user (*Kansas v. Colorado,* 206 U. S. 46, 94, 51 L. Ed. 956, 973, 27 S. Ct. 655; *Sternberger v. Seaton Co.,* 45 Colo. 401, 403, 102 Pac. 168; *Re Water Rights of Hood River,* 114 Ore. 112, 227 Pac. 1065; *State, ex rel., v. Knapp,* supra; *Baumann v. Smrha,* supra). The effect of the common-law doctrine in Kansas under the Act is little more than legal fiction. The right of the plaintiff to ground water underlying his land is to the usufruct of the water and not to the water itself. Legislation limiting the right to its use is in itself no more objectionable than legislation forbidding the use of property for certain purposes (*Euclid v. Ambler Co.,* 272 U. S. 365, 71 L. Ed. 303, 47 S. Ct. 114, 54 A. L. R. 1016; *Mugler v. Kansas,* 123 U. S. 623, 31 L. E. 205, 8 S. Ct. 273).

As we have seen, the ownership of land does not carry with it any ownership of vested rights to underlying ground water not actually diverted and applied to beneficial use. Nor do we regard such a landowner as having a vested right, as the plaintiff contends, to ground water underlying his land which he has not appropriated and applied to beneficial use. A common-law claimant such as the plaintiff who has not initiated any actual use of the water for any beneficial purpose is limited to an action at law against the appropriator subsequently developing water uses under a permit from the chief

engineer for earlier appropriation uses perfected under the Act (82-712, 716, 721 *a*). In the overall, rather than suffering an infringement of any right, the plaintiff is afforded rights and protection by the Act which did not exist under the common-law to which he was subjected prior to its passage.

We find nothing in the Act which in any manner offends the Fourteenth Amendment to the constitution of the United States or in any way violates the constitution of Kansas. There is no inhibition in our constitution against legislation such as this regulatory Act which we find to be a proper and valid exercise of the police power.

The plaintiff contends that the title of the Act is defective and in violation of Art. 2, Sec. 16 of the constitution of Kansas. The contention is untenable. The compass of the enactment is one of comprehensive regulation of water usage. The Act contains only one subject which is clearly expressed in the title. Any attempt to say otherwise places a forced construction on words of simple and unambiguous meaning.

The plaintiff claims that to require him to make application and furnish information for an appropriation permit to use water from his own land for beneficial purposes is a denial of due process. The contention is without substance. The Act, regulatory in purpose and nature, requires that water users make application and furnish information to the chief engineer of the Division of Water Resources concerning the proposed use (82a-709). Such a requirement is not a confiscation of water rights by legislative fiat. Rather, it is a proper and reasonable exercise of the police power of the state in controlling water use for the purpose of preventing waste and to conserve a valuable natural resource. Moreover, the point was decided adversely to the plaintiff in *State, ex rel., v. Knapp,* supra, where it was said:

". . . If the state is to control and regulate the waters of the state other than for domestic use it must ascertain what other use is being made of the water by riparian owners, and *the act is not invalid because it authorizes the chief engineer to ascertain what other use is being made of the property and to require the owner to furnish a statement of such use and to obtain the approval of the chief engineer thereto, with the right of the owner to appeal to the district court from the determination of the chief engineer. . . ."* (Emphasis supplied.) (l. c. 556.)

The plaintiff further contends that just compensation is required to be made for the taking of unused water underlying his land, and

lack of provision therefor so permeates the Act that it is void *in toto.* We do not agree. If he thinks he has been damaged by the pumping of the ten water supply wells in question, the Act gives him a right to commence a suit for such damage (82a-716, 721 *a*). The suggestion that he has such rights in ground water underlying his land as must be acquired by eminent domain is untenable (*State, ex rel., v. Knapp,* supra).

As previously indicated, this was an action to enjoin Wichita from drilling or pumping water supply wells when its prior application for an appropriator's permit therefor had been regularly made to the chief engineer of the Divison of Water Resources. The plaintiff concedes that he has no water-right uses which are protected by the Act and he makes no claim to any right under the Act. While he introduced evidence of damage to his land, he did so only after the district court held the Act to be unconstitutional, to establish that his remedy at law was inadequate and that injunctive relief was proper. The Act not being unconstitutional, the district court should have entered judgment in favor of Wichita.

The judgment is reversed.

SCHROEDER, J., dissenting: Not to be outdone by the legislature in the confiscation of private property, the Supreme Court of Kansas today upholds the constitutionality of the 1945 Water Appropriation Act (G. S. 1949, 82a-701, *et seq.*) *by decreeing an established property right* (one which even the legislature and the city of Wichita recognized) *to be nonexistent.* Kansas decisions declaring the right of the landowner to the underground water in his land to be a common law *vested property right* are inferentially *overruled, and, in effect, the new rule of law is given retroactive application to the time of origin of private land titles by patent from the U. S. Government*—prior to the time Kansas was admitted to statehood. If such *arbitrary* exercise of the *police power* of the state withstands the federal constitutional test of due process, the formula has been found, and the precedent is established, by which all private property within Kansas may be *communized* without cost to the state.

It is a rule established in all just governments that when private property is required for public use, indemnity shall be given by the public to the owner.

In June, 1944, the Supreme Court of Kansas was confronted with

an attempt by the state to regulate the subterranean waters within the geological formation known as the Equus Beds in Harvey and McPherson Counties in the case of *State, ex rel., v. Board of Agriculture,* 158 Kan. 603, 149 P. 2d 604. These waters are precisely the same waters which are the subject of this litigation.

After reviewing numerous Kansas authorities the court concluded:

"Under the above authorities underground waters are part of the real property in which they are situated. The owner of land may convey or grant the underground water, or the right to take it from the land, by an appropriate instrument in writing to the same extent that he might convey or grant any other portion of the real property; or a party, having the right of eminent domain, may appropriate underground water to his use by condemnation proceedings." (p. 609.)

The court further clarified the nature of these waters by the following discussion in its opinion:

"Defendants ask us to take judicial notice of the fact that:

" 'Both surface and underground waters are [to some extent] migratory and under natural laws of gravity seek their own lowest level.'

"Judicial notice may be taken of those facts as well as of the fact that by evaporation waters become elevated and mingle with the atmosphere. Defendants in their brief state:

" 'The corpus of the water in its natural state, and this includes water beneath the surface of the ground, is flowing, moving, circulating, oozing, filtering, percolating or falling from the physical confines of the realty owned by one person to realty owned by another.'

"As a general statement this may be conceded. They further assert:

" 'In this natural state the corpus of the water is not the exclusive property of any individual but is a public water resource.'

"This statement is too broad. *An owner of land owns its surface and underground water by the same title as he owns the land itself, and the clay, gravel, coal or oil within it, even though these items of property differ in component parts.* The land itself, or any of its parts, is a public resource in the sense that it may be taken for a public use, or the state may prohibit its waste or its use in a manner detrimental to others.

"Defendants further advise us:

" 'Defendants do not recognize any private property right in unused water or in unused sources of water supply and believe that only when an established right or appropriation authorizing a user to take and use from that source is diminished or extinguished to point of causing injury to his prior established appropriation can the user recover any substantial damage or maintain any action for injunctive relief.'

"*This doctrine seems somewhat startling.* All we care to say about it is that *we think it contrary to the law of this state, repeatedly stated in our decisions hereinbefore discussed.*" (pp. 609, 610.) (Emphasis added.)

Thereupon the court reviewed the various statutes throughout the history of the state pertaining to waters, their ownership, disposition and use, and concluded that the statute then before the court, G. S. 1935, 74-509, did not authorize the defendants (the State Board of Agriculture, the Division of Water Resources within that board, and its chief engineer) to regulate, allocate or distribute, or otherwise interfere with the use and consumption of underground waters or to conduct a hearing upon the application of anyone desiring to use such waters, or for the allocation, distribution or regulation of the use of such waters.

The court had previously in the opinion recognized that throughout the history of the state there had been no departure from the basic principle that water rights in this state were governed by the common law except as they may have been modified by statute. Thus, prior to the enactment of the 1945 Water Appropriation Act of Kansas, the common law of this state, as declared by the decisions of the Supreme Court, established the right of the landowner to the underground water in his land (whether such water was "used" or "unused") as a *private property right*. The underground water was subject to conveyance or grant by an appropriate instrument in writing to the same extent that the owner of the land might convey or grant any other portion of the real property. A party, having the right of eminent domain, could appropriate the underground water to his use by condemnation proceedings, paying the fair market value therefor. The owner of the land owned the underground water *by the same title* as he owned the land itself, and the clay, gravel, coal or oil within it.

Later in *Arensman v. Kitch*, 160 Kan. 783, 165 P. 2d 441, in the year 1946, after the enactment of the 1945 Water Appropriation Act, the court said:

". . . Under our decisions *water in the land is a part of the land itself* and any enforceable claim to water from appellee's real estate based upon circumstances and conditions arising subsequent to the date of the execution of appellant's lease would have to be based upon a grant in writing . . ." (p. 791.) (Emphasis added.)

The court then quoted from *State, ex rel., v. Board of Agriculture, supra*, and cited numerous other cases.

In the year 1949 constitutional questions regarding the 1945 Water Appropriation Act were before the court in *State, ex rel., v. Knapp*, 167 Kan. 546, 207 P. 2d 440. There a riparian landowner on the Republican River in Kansas, eighty miles downstream from

the Harlan Dam in Nebraska, claimed a vested interest in flood waters of the river impounded in the Harlan Dam. Actually, the court did not there have the constitutional validity of the 1945 Water Appropriation Act before it. This is indicated by the following language in the opinion:

"We next observe that *no complaint is made of section 702*, which declares: 'All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein provided.' *This is the heart of the statute.* The rest of it treats of details and procedure. . . .

"Considering the portions of the statute dealing with details and procedure we find nothing seriously wrong with them. We have diffculty in seeing that the owner of land in Kansas riparian to the Republican river has a vested interest in floodwaters of the river impounded in the Harlan dam, eighty miles or more from his property. . . ." (p. 555.) (Emphasis added.)

The general rule of law is well settled that only those constitutional questions which are duly raised and insisted upon and are adequately argued will be considered by the Supreme Court on appeal. (*State, ex rel., v. Richardson,* 174 Kan. 382, 256 P. 2d 135; and *State, ex rel., v. Fadely,* 180 Kan. 652, 308 P. 2d 537.) The court will not inquire into the constitutionality of a statute on its own motion. (*Missionary Baptist Convention v. Wimberly Chapel Baptist Church,* 170 Kan. 684, 688, 228 P. 2d 540; and see *Coryell v. Hardy,* 146 Kan. 522, 72 P. 2d 457.) Furthermore, a court will not undertake to pass upon the validity and effect of a statute unless it is necessary to the determination of an actual controversy. (*Missionary Baptist Convention v. Wimberly Chapel Baptist Church,* supra, and authorities cited therein.) The foregoing rules were the basis of the holding in the *Knapp* case.

Therefore, prior to the decision of the court herein it would be correct to say the constitutional validity of the 1945 Water Appropriation Act (L. 1945, Ch. 390), had not been determined, since the section of the act which is its very heart (G. S. 1949, 82a-702) *is being challenged for the first time.* Furthermore, the court in the *Knapp* case was dealing with a riparian owner on a surface stream who claimed rights to flood water impounded eighty miles upstream in another state pursuant to a tri-state compact (G. S. 1949, 82a-518). The court was not confronted with subterranean waters.

It could hardly be said the Supreme Court of Kansas would defer the determination of this vital question of state policy in the first

instance to the federal courts. The construction of state statutory provisions is left to the states in the first instance, if the state has authority to enact such law. (*Higgins v. Cardinal Manufacturing Co.*, 188 Kan. 11, 21, 360 P. 2d 456, cert. den. 368 U. S. 829, 7 L. Ed. 2d 32, 82 S. Ct. 51; and *Williams v. Oklahoma*, 358 U. S. 576, 3 L. Ed. 2d 516, 79 S. Ct. 421, rehearing den. 359 U. S. 956, 3 L. Ed. 2d 763, 79 S. Ct. 737.)

Thus, in *A. B. Williams v. City of Wichita, Kansas, a Municipal Corporation, et al.* [10th U. S. C. A. 1956], 230 F. 2d 959, where litigation between the parties to this action was pending in a court of this state, in which the questions and issues in the federal action might be determined, it was recognized that such questions and issues involved an interpretation of Kansas state laws (the 1945 Water Appropriation Act) and *should appropriately be determined by the state courts.* In a memorandum decision it was held that no action be taken on the motions to dismiss, and that action thereon be held in suspense for a reasonable time to await determination in the state courts of important questions of state law involved therein.

In *Baumann v. Smrha* [U. S. D. C., D. Kan. 1956] 145 F. Supp. 617, aff'd per curiam, 352 U. S. 863, 1 L. Ed. 2d 73, 77 S. Ct. 96, a three-judge Federal District Court for Kansas was requested in a declaratory judgment action to determine whether the 1945 Water Appropriation Act violated the Fourteenth Amendment to the United States Constitution. In the opinion the court said:

"We hold that the state could properly apply the doctrine of prior appropriation and application to beneficial use to unused and unappropriated waters so long as it recognized and afforded protection to rights which landowners had acquired at the time of the effective date of the Act to appropriate and use water.

"Whether such a change in the law of Kansas is contrary to earlier decisions of the Supreme Court of Kansas, it is cognizant with the latest decision of the Supreme Court of Kansas in *State ex rel. Emery v. Knapp,* 167 Kan. 546, 207 P. 2d 440, *which must be regarded as having overruled the earlier cases."* (p. 625.) (Emphasis added.)

The foregoing assumption, of course, that the *Knapp* case overruled earlier decisions is not binding upon the Kansas Supreme Court which is called upon to construe its own decisions. (See *Thompson v. Consolidated Gas Co.*, 300 U. S. 55, 81 L. Ed. 510, 57 S. Ct. 364, and authorities cited therein at note 21.)

G. S. 1949, 82a-702, provides:

"All water within the state of Kansas is hereby dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein prescribed."

By the foregoing section of the Act the legislature has appropriated all water within the state of Kansas for and on behalf of the state. Without such an appropriation, or ownership of water taken in the name of the state, there could be no *dedication* of all water in the state of Kansas to the use of the people of the state. In other words, before all water in the state can be dedicated to public use the state must own such water.

Such an appropriation of all water in the state by the legislature is nothing short of an outright *confiscation* of all property rights in water which the legislature subsequently refuses to recognize as a "vested right" under the Act, because *it makes no provision for the state to pay the owners of such water for the property rights taken.*

In the instant case the plaintiff below concedes that he has no "vested rights" (water right uses) which are protected by the Act, and he makes no claim to any right under the Act. The court in its opinion says the 1945 Water Appropriation Act, which seeks to impose "the appropriation doctrine and the rule of priority of right," was intended to apply only to such water as was not being "beneficially used at the time of the passage of the Act, that is, to our undeveloped and consequently unused water resources."

The legislature, however, recognized that *private property rights* to "unused" water were taken from the common law owners in 82a-702, *supra.* This is disclosed by a further section of the Act, G. S. 1949, 82a-716, which as originally enacted reads in part:

"If any appropriation, or the construction and operation of authorized diversion works results in an injury *to any common law claimant,* such person shall be entitled to due compensation in a suitable action at law against the appropriator for damages proved *for any property taken.* An appropriator who has acquired a valid right under this statute may prevent, by injunction, a subsequent diversion *by a common-law claimant of private rights* without being required to first condemn possible *private rights.* . . ." (Emphasis added.)

The alteration made by the amendment to this section of the Act, now appearing as G. S. 1959 Supp., 82a-716, changed the second sentence above quoted to read as follows:

". . . Any person with a valid water right or permit to divert and use water may restrain or enjoin in any court of competent jurisdiction a subse-

quent diversion by *a common-law claimant* without vested rights without first condemning *those common-law rights.* . . ." (Emphasis added.)

The common law claimant referred to in the first sentence of the above section is not described as a common law claimant having "vested rights" under the Act. And such claimant is said to have a cause of action against an appropriator under the Act for damages proved for any *property* taken. That this was the intention of the legislature is indicated by the second sentence of the section, as amended, when it refers to the common law claimant *without "vested rights"* under the Act as having common law rights. Thus, the legislature in 1957 by the amendment, *although expressly waiving* the requirement of condemnation by an appropriator of water under the Act, elucidated in the Act by expressly recognizing the existence of affected common law property rights. The legislature speaks of "vested rights" as that term is defined in the Act and continues to acknowledge the existence of private property rights of common law claimants. The common law property rights of these common law claimants were *vested property rights* (in the legal sense of the term) when the 1945 Water Appropriation Act was enacted by the legislature.

The term "vested right" under the Act is defined in G. S. 1959 Supp., 82a-701 as follows:

"(d) 'Vested right' means the right *of a person under a common law or statutory claim* to continue the use of water having actually been applied to any beneficial use, *including domestic use, on or before June 28, 1945,* to the extent of the maximum quantity and rate of diversion for the beneficial use made thereof, and shall include the right to take and use water for beneficial purposes where a person is engaged in the construction of works for the actual application of water to a beneficial use on June 28, 1945, provided such works shall be completed and water is actually applied for such use within a reasonable time thereafter by such person, his heirs, successors or assigns. *Such a right does not include, however, those common law claims under which a person has not applied water to any beneficial use within the periods of time set out in this subsection."* (Emphasis added.)

The italicized portions of the above definition were added by the legislature in 1957, otherwise the section is substantially as it appeared in the original act.

Here again the legislature makes reference to common law claims regarding "unused" water (water not having actually been applied to any beneficial use as defined in the Act) and excepts the *rights of such common law claimants* from the definition of "vested right" under the Act.

A further indication that the legislature intended to recognize *vested property rights* of common law claimants in "unused" water as defined in the Act is found in the report of the governor's committee, appointed to study the subject of water rights in 1944, which reads in part:

"The Committee believes that conditions, and the needs of the people in Kansas, have changed so greatly since the early adoption of the common law as applied to water use, that the time has come to modify the common law to the extent necessary to set up a system of appropriation, based on priority of right, *but without depriving the common-law owner of relief by proper compensation for limitations placed on unused common-law rights.*" (Emphasis added.)

(See *State, ex rel., v. Knapp,* 167 Kan. 546, 551, 207 P. 2d 440.)

In December of 1944 the report of the governor's committee on the proposed Water Appropriation Act found it would be necessary: "(3) *to allow a common law owner of unused water rights a means of recovery for such damages as he is able to prove he has suffered by an injury or impairment of his property or of any right to initiate a later use of water.*"

The committee recognized the existence of *private property rights* in a common law owner of unused water and the impairment of such property or of any right to initiate a later use of water. This report was before the legislature and it may be assumed the enactment intended to meet the requirement of the foregoing finding of the committee.

The question is whether the legislature has met the federal constitutional requirement of due process of law relative to existent private property rights taken from common law owners by the 1945 Water Appropriation Act. This subject will be treated after further analysis of the record and of the court's construction of the Act.

Recognition by the city of Wichita that the subterranean water here under consideration was the subject of *existent private common law property rights in 1953* is indicated by the written instrument through which it acquired well sites. The deeds acquiring the five-acre *sites* for each of the ten water wells which are the subject of this action, except for the names of the grantors, are identical. Well site No. 47 which gave rise to this cause of action (later expanded to ten well sites) was acquired by the following "Indenture of Conveyance" which reads in part:

"THIS INDENTURE, made on this 21st day of May, 1953, by and between Frederic W. Cooper and Dorothy C. Cooper, man and wife, of the County of Harvey, State of Kansas, hereinafter called the Parties of the first part, and

"THE CITY OF WICHITA, a municipal corporation, located in Sedgwick County in the State of Kansas, hereinafter called the Party of the second part;

"WITNESSETH: That the Parties of the first part, *in consideration of Two Thousand and no/100 Dollars,* the receipt of which is hereby acknowledged, do by these presents, give, grant, bargain, sell and convey unto said Party of the second part, its successors and assigns:

"1. *All of the water bearing sands and water rights now, or at any time, and at all times hereafter in or under said tracts hereinafter described.*

"2. The *right to use* in the proper enjoyment of such water and water *as much of the surface of said tracts of real estate as may be necessary or desirable on the part of the Party of the second part to carry out the terms of this grant.*

"3. The right in perpetuity to drill for, produce, and transport *sub-surface water* therefrom.

"4. The right to go upon the surface of said lands above described *to* explore and *drill for, procure and extract any and all sub-surface water,* either for experimental purposes or *for a permanent supply,* and to remove and transport the same for such use and uses in the City of Wichita and its environs, as the Party of the second part may from time to time elect to make of it, *including all of the sub-surface water.*

"(*a*) *Which may* at any time and at all times during the continuance hereof *be stationary in and under said land or any part thereof,* and

"(*b*) *Which may flow or percolate thereto from other lands,* including the right of ingress and egress by the officers, agents and employees of the Party of the second part, and by any other party authorized by it to enter upon said premises to carry out the purposes of this grant.

[Provisions relating the rights to lay and maintain pipe lines; construct, operate and maintain measuring 'wells; and to maintain and remove tanks, machinery, fixtures and improvements upon the land are omitted.]

"8. *The tracts of real estate in, under and to which the foregoing rights and interests are granted* are described as follows, to-wit: *Five acres in square form in the southwest corner of the SW¼ of the SE¼, Section 24, T24S, R3W, Harvey County, Kansas.*

"IT IS UNDERSTOOD AND AGREED BY AND BETWEEN THE PARTIES that this indenture does not carry with it any oil and gas in place of the right to explore for or extract the same." (Emphasis added.)

[The habendum, warranty and signature clauses are omitted.]

It is readily apparent the city of Wichita recognized the existent *private property right* of the landowner to the "unused" subsurface water in the land. The city paid $400 per acre for the property rights to this water. The deed was not a conveyance of land, but a conveyance of the water-bearing sands and water rights under the surface of the five-acre tract, together with a right to use so much of the surface as was necessary to extract and remove the

water from the tract. By these written instruments of conveyance the city of Wichita recognizes the economic value of the property right of the common law owner to the "unused" subsurface water in the land, and such instruments of conveyance were all executed long after the enactment of the 1945 Water Appropriation Act. It is a fair indication the city of Wichita has not placed much faith in the constitutionality of the 1945 Water Appropriation Act, or that it has construed the Act differently than the construction given it by the court.

How did the court construe the 1945 Water Appropriation Act, and what happened to Kansas decisions which declared the subsurface water (whether "used" or "unused") in the land to be a common law *private property right* of the landowner?

The court, after reviewing the evidence of the actual conditions and characteristics of the Equus Beds formation, and the facts concerning the extent and manner of withdrawals of water therefrom, concluded that from the evidence "emerges the salient and clear factual conclusion that these ground waters are percolating and hence migratory and fugitive," and by reason thereof the court was "dealing with a right to *use* the underground waters as they pass through the owner's soil." Although the court recognized the common law rule prior to 1945, in that percolating ground water "belongs" to the owner of the land in which it is found, it concluded the decisions which dealt with the subject did not define the "ownership" of the corpus of the water, and said:

"The common law concept of 'absolute ownership' of percolating water while it is in one's land is an anomaly—while giving him the right to abstract from his land all the water he can find there, it affords him no protection against the acts of his neighbors who, by pumping on their own land, manage to draw out of his land all the available water it contains. Much of the language in the cases pertaining to absolute ownership is *obiter dicta* and completely unnecessary to the respective decisions. Moreover, ownership as a concept is often vague and denotes only certain rights of use against certain persons with respect to certain physical phenomena. *Thus the use of the term 'ownership' as applied to percolating water has never meant that the overlying owner had a property or proprietary interest in the corpus of the water itself.* This necessarily follows from the physical characteristics of percolating water. It is migratory in nature and is a part of the land only so long as it is in it. *There is a right of use as it passes, but there is no ownership in the absolute sense. . . .*" (Emphasis added.)

From this point the rule for ground waters which have not been reduced to the possession and control of the overlying owner are

said to be analogous to the rule applicable to surface water in a stream, citing *Wallace v. City of Winfield,* 98 Kan. 651, 159 Pac. 11, which is said to hold:

". . . that a riparian owner had no title to the corpus of the water in the river; that the water was not 'his,' and until he reduced it to his possession and exercised control and management over it, did he obtain a property right in it; that his right was to the *use* of the water—a property right of a usufructuary nature that 'attached' to the riparian land; that as an incident of the land, the right of use accompanied a conveyance of the real property and since there was no ownership of the water, he could not recover the value of any such water wrongfully diverted."

Reference is made to *State, ex rel., v. Knapp,* supra, which was said by the court to be concerned with the *privileges* of adjacent owners to a stream, while in the instant case the court was concerned with the *privileges* of surface owners, and the difference was said to be slight. The court concluded "The right of the plaintiff to ground water underlying his land is to the usufruct of the water and not to the water itself," and held "it was within the competency of the legislature to define the 'vested rights' of common-law water users, or to establish a rule as to when and under what conditions and to what extent a vested right should be deemed to be created in such a water user." The suggestion that the plaintiff had such rights in ground waters underlying his land as must be acquired by eminent domain was said to be *untenable.*

By the foregoing process of reasoning *a vested common law property right has been decreed to be nonexistent.*

In 1944 the ground water underlying a tract of land was said to be owned by the owner of the land "by the same title as he owns the land itself, and the clay, gravel, coal or oil within it, even though these items of property differ in component parts" (*State, ex rel., v. Board of Agriculture,* 158 Kan. 603, 609, 149 P. 2d 604). The foregoing rule of law was again approved in 1946 (*Arensman v. Kitch,* 160 Kan. 783, 165 P. 2d 441). The foregoing language, repeated throughout the decisions, was an outright recognition by the court of *a common law private property right* to ground water underlying the land. By declaring the landowner's title to the ground water underlying a tract of land to be *equivalent to* the landowner's title to the land itself, the most forceful language at the court's command was employed. It established a common law *vested property right* to the ground water underlying the land.

In substance the court has *overruled* all prior decisions establish-

ing a common law *private property right* to the ground water underlying the owner's land, and it has declared the new policy, or law, to be *retroactive* in point of time to the origin of all land titles in the state. The land titles in the Equus Beds area were not acquired from the state of Kansas, but from the public domain by a patent issued from the United States Government prior to the statehood of Kansas. These land titles have passed in succession by conveyance, or otherwise, to subsequent owners. The state of Kansas has never owned the land.

The Desert Land Act of 1877 (43 U. S. C. 321) enacted by the Congress of the United States, allowed entry and reclamation of lands within the western states and territories, which have since become states. It contained a proviso to the effect that the right to the use of water should depend upon *bona fide* appropriation, not to exceed the amount of water actually appropriated and necessarily used for the purpose of irrigation and reclamation, and declared the surplus should be held free for the appropriation and use of the public for stated purposes. This act was held in *Power Co. v. Cement Co.*, 295 U. S. 142, 79 L. Ed. 1356, 55 S. Ct. 725, *to sever*, in effect, *all waters upon the public domain, not theretofore appropriated, from the land itself*, and that a patent issued thereafter for lands in a desert-land State or Territory, under any of the land laws of the United States, carried with it of its own force, no common law right to the water flowing through or bordering upon the lands conveyed. The court further held the owner of the public domain, the United States, had power to dispose of the land and water together or separately.

Kansas was *not* included as one of the states or territories covered by the Desert Land Act of 1877. Thus, all common law rights to the water in Kansas passed from the United States to the original owners by patent.

On October 31, 1868, Section 3, Chapter 119 of the General Statutes of 1868, now appearing without change as G. S. 1949, 77-109, became effective. It provided that the *common law* as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the General Statutes of this state.

Thus, upon enactment of the 1945 Water Appropriation Act the legislature was confronted with *common law vested property rights* to ground waters of the state.

Since Kansas was not affected by the Desert Land Act of 1877, the confiscatory nature of the 1945 Water Appropriation Act of Kansas is not overcome by the fact it makes no distinction between ground water and surface waters and applies the appropriation doctrine recognized by the laws of the seventeen western states, or by the fact that twelve of those western states now have statutes applying the appropriation doctrine to percolating ground waters. The states of Idaho and New Mexico accomplished the adoption of the appropriation doctrine with respect to percolating ground waters by judicial decision upon the strength of the Desert Land Act of 1877 which affected the prior development of their respective state laws. (*Hinton v. Little*, 50 Ida. 371, 296 Pac. 582; and *Yeo v. Tweedy*, 34 N. M. 611, 286 Pac. 970.)

Never in the history of Kansas law or of the common law has it been necessary to trace "particles" of water lying beneath the surface of the land to establish *a property right* to such water. Water is homogeneous in character—one gallon taken from the Equus Beds is the same as any other gallon. If the forces of nature cause the percolating ground water to move in a southerly direction for one day to the extent of three feet, the portion that percolates from the boundary of one's land on the south is replaced by water of the same quality on the north. The only perceptible change, if any, is in the elevation of the *water table* beneath the surface of the land.

Common law judges for generations past have been wise to the laws of nature. They recognized the forces of nature and the properties of water in declaring the common law relative to ground water, just as in 1944 judicial notice was taken by Justice W. W. Harvey writing for the court in *State, ex rel., v. Board of Agriculture*, supra.

Analogous situations are presented regarding commodities such as grain and money. One who holds a warehouse receipt for 1,000 bushels of wheat of a given grade and quality has a *property right* to such grain in the warehouse even though it is commingled with other grain of like grade and quality. The owner cannot trace the kernels of wheat he delivered, neither can the warehouseman. But the inability to trace the precise kernels of wheat and thereby identify the "corpus" of the grain which he delivered is immaterial in law to the proprietary interest of the holder of the warehouse receipt. Such grain is said to be "Fungible grain" (G. S. 1949, 34-

223), and the return of 1,000 bushels of grain of like grade and quality by the warehouseman upon demand of the owner is sufficient in the eyes of the law. (See *Central States Corp. v. Luther,* 215 F. 2d 38, cert. den. 348 U. S. 951, 99 L. Ed. 743, 75 S. Ct. 438.)

It must be recognized that the people of the state have no vested right in the decisions of a court. They can be overruled or modified. But a change in property law is usually given only *prospective* application, *not retroactive application.* This is particularly true where property rights have been established and vested in the owners by former decisions of the court. Heretofore the court has been extremely cautious and reluctant to interfere with any law or rule which might affect title to real estate, lest it disturb *vested* rights and create confusion and unrest.

It must also be recognized that the legislature has power to change a rule of common law by legislative enactment. But here again the act or new law is given *prospective* application, and *not retroactive application.*

This situation was presented in *Frizell v. Bindley,* 144 Kan. 84, 58 P. 2d 95, where Chapter 115 of the Laws of 1886 (repealed, L. 1941, ch. 261) attempted to impose the principle of "appropriation" to water in a running stream for purposes of irrigation. The statute was held ineffective as against other owners of riparian lands held under United States patents which antedated the statute. These riparian owners' rights to the waters of the creek were said to be dependent upon the law of this state at the time their lands passed into private ownership. Those rights were such as attached to riparian lands at common law. The court said:

"And since the common-law rule is that riparian rights are incidents of the land itself, quite different from easements which may be lost through non-user . . ., those rights, so far as concerns the present litigants, were vested prior to the statute of 1886 and unaffected thereby. . . ." (p. 92.)

Vested property rights, previously established by the court's decisions, are not destroyed by the legislative enactment. Where such vested rights are taken they must be recognized and indemnity given by the public to the owner, just as the governor's committee in 1944 found it would be necessary for the legislature to do regarding the proposed water act.

But what the legislature feebly attempted to do in the 1945 Water Appropriation Act of Kansas by giving common law claimants a cause of action for damages proved for "any property taken" under the provisions of the Act, *the court has "construed" away.*

The court in its construction of the Act says:

"As we have seen, the ownership of land does not carry with it any ownership of vested rights to underlying ground water not actually diverted and applied to beneficial use. Nor do we regard such a landowner as having a vested right, as the plaintiff contends, to ground water underlying his land which he has not appropriated and applied to beneficial use. A common-law claimant such as the plaintiff who has not initiated any actual use of the water for any beneficial purpose is limited to an action at law against the appropriator subsequently developing water uses under a permit from the chief engineer for earlier appropriation uses perfected under the Act (82a-712, 716, 721 [a]). In the overall, rather than suffering an infringement of any right, the plaintiff is afforded rights and protection by the Act which did not exist under the common-law to which he was subjected prior to its passage." (pp. 339, 340.)

The foregoing simply says the landowner has lost nothing under the Act which he had under the common law of Kansas as to the "unused" ground water underlying his land, but the Act gives him an action at law against an appropriator—an action which he did not have under the common law for rights which did not exist under the common law.

The landowner is told that nothing has been taken from him which is *compensable*. At best, the court has described what was taken under the Act from the common law claimant as a "*privilege*." Obviously, the power of the state *to regulate* under the police power would not subject the state to liability for compensable damages for the denial or the withholding of a *privilege*. If the state is not obligated to pay compensable damages for the taking of a privilege from common law claimants, how can it shift a liability which does not exist to an appropriator under the Act? The answer is that *the new cause of action is not designed to compensate the owner of "unused" water for those common law vested property rights which have been taken from him by the Act.*

Long after the decision in *Wallace v. City of Winfield*, 98 Kan. 651, 159 Pac. 11, upon which the court relies for the proposition that a riparian owner had no title to the corpus of the water in the river, it was held in *Frizell v. Bindley*, 144 Kan. 84, 58 P. 2d 95, that the water rights of a riparian owner were incidents of the land itself and were *vested* in the common law owner, and that such *vested rights* could not be lost through nonuser. (See G. S. 1961 Supp., 82a-721a.)

Even though the legislature expressly recognized that its definition of a "vested right" did not include common law claims under

which a person had not applied water to any beneficial use as defined in the Act, and such common law claimants were said to have a cause of action for damages proved for *any property taken,* the court holds that the legislature has power to declare what persons had *vested rights* under the law of Kansas at the time of the enactment.

The full thrust of the holding by the court is found in the statement, "It is these recognized use rights ['vested rights' as defined in 82a-701(*d*), *supra*] that may not be taken or destroyed in the absence of due process of law." (p. 334.) This is a tacit *admission* that common law rights to the "unused" waters of the state have been taken without due process of law—the payment of just compensation. As to these common law rights the court says, in substance, the state may take them *without due process of law.* It says, "The effect of the common-law doctrine in Kansas under the Act is little more than *legal fiction.*" (p. 339.) (Emphasis added.) By describing the 1945 Water Appropriation Act as a "regulatory Act" it is found by the court to be a proper and valid exercise of the *police power.*

Giving the holder of common law *vested property rights* a cause of action for *a right which did not exist at the common law* is no substitute for due process of law, and *nowhere in the court's opinion is it said to be a substitute.* Such cause of action is not against the state, the one who confiscated such common law property rights, but against some unknown third party or person, an appropriator, who may not be capable of identification or acquire appropriation rights until long after the effective date of the Act.

Once the court decreed *common law vested property rights* to the "unused" percolating ground waters of the state to be *nonexistent,* it became relatively simple to answer whether the 1945 Water Appropriation Act of Kansas violated the due process clause of the Fourteenth Amendment to the Constitution of the United States, or any provision of the Constitution of Kansas, requiring indemnity to the owner where private property is taken for public use.

Under the court's construction of the Act, the legislature is now in the position of having paid no attention to the admonition of the governor's committee "to allow a common law owner of unused water rights a means of recovery for such damages as he is able

to prove he has suffered by an injury or impairment of his property or of any right to initiate a later use of water."

A *primary use* of water from the large reservoir of the Equus Beds is so obvious that it has been overlooked by both the legislature and the court. For this reason the term "unused" has heretofore been set out in quotation marks to identify the term as it has been used by the legislature and the court.

The uncontroverted evidence in the record as summarized by the court was that "a large amount of ground water is lost by evapotranspiration—the natural utilization of water by plants from absorption in their root systems. The process is accelerated by hot weather and winds." (p. 324.) It is incorrect to say the utilization of water from the soil by plant growth is waste, or that the water is lost. It is by this process *beneficially used.* This use of the water from the reservoir in the Equus Beds is subirrigation. The water table throughout most of the Equus Beds area *under normal conditions* is at a sufficient elevation to effectively provide irrigation for the growing crops planted on the land in this area.

Scientific facts which may be judicially noticed are that the roots of the winter wheat plant penetrate the soil in the process of plant growth to a depth of eight feet or more. The roots of the alfalfa plant have been known under favorable conditions to go to a depth of twenty feet, and the roots of corn and other agricultural plant crops likewise go to sufficient depths to tap the reservoir of water.

It is by reason of this subirrigation that the Equus Beds area in Kansas is known as a garden spot with capability of producing abundant agricultural commodities, even though drouth conditions may prevail in given seasons.

The process of nature by which plant growth takes place—a scientific fact—may also be judicially noticed. It is known that a large elm tree in the hot summer of Kansas will absorb from the soil as much as two hundred gallons of water in one single day and give it off into the air from its leaves by transpiration. This is the process by which plants grow, combining the elements in the soil and in the air with the energy from the sun through the medium of water into vegetative growth and seed production. Failure to recognize this natural use of water, which is actually a beneficial use of the water by the landowner who tills the soil and plants the crops, is simply a refusal to recognize the facts of nature. Such

failure results in an *arbitrary standard* which deprives landowners of the right of full enjoyment of their land.

Can both the court and the legislature blindly close their eyes to this *established use of underground water* in the Equus Beds area and say that such application of water to a beneficial use is not a vested right in the common law owner? I think not. Even under the definition of "vested right" given by the legislature in G. S. 1961 Supp., 82a-701(*d*) this beneficial use of water is a vested right. Under the Act these common law claimants are entitled to continue the use of water which has actually been applied to a beneficial use. (See *Heise v. Schulz*, 167 Kan. 34, 204 P. 2d 706.)

Under the court's construction of the Act the *new cause of action* (not being designed to compensate the common law claimant for rights taken from him by the Act) must be given some attention. The court says: "It is sufficient to say that while the Act denies injunctive relief to common-law claimants, such as the plaintiff here seeks, it affords protection to common-law owners who have not initiated any use of water for beneficial purposes by giving them a cause of action at law to recover due compensation against an 'appropriator' for damages proved for any property taken (82a-716), or for any injury done to their lands *or to any water rights appurtenant thereto* (82a-721a)." (p. 335.) (Emphasis added.)

It is to be noted from the foregoing statement that common law claimants *who have not initiated any use of water for beneficial purposes* are said to have a cause of action at law for injury done to any *water rights* appurtenant to their land. The expression emphasized in the above quotation is the language used by the Act in G. S. 1961 Supp., 82a-721a. This is important because when the term "water right" is used in the Act it has a defined meaning. G. S. 1961 Supp., 82a-701 provides in part:

"When used in this act, unless the context indicates otherwise, the following words shall have the following meanings:

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(*g*) 'Water right' means any vested right or appropriation right under which a person may lawfully divert and use water. *It is a real property right appurtenant to and severable from the land* on or in connection with which the water is used and such water right passes as an appurtenance with a conveyance of the land by deed, lease, mortgage, will, or other voluntary disposal, or by inheritance." (Emphasis added.)

From the foregoing it is apparent even the court has recognized that a common law claimant, who has not initiated any use of water

for beneficial purposes, has a cause of action for injury done to a water right appurtenant to his land, described by the Act as a *real property right* appurtenant to the land; or would it be better to say under the court's construction of the Act that the new cause of action was only intended for those who have a "vested right" or an "appropriation right" as defined in the Act?

Confusion has no doubt crept into the court's opinion through the fictional process of reasoning by which it hurtles from a discussion of ownership of the corpus of percolating ground water *in the absolute sense* to *privileges*, totally ignoring in the process the whole common law concept of property rights that exist between these extremes.

The term "property" embraces every species of valuable right and interest, including real and personal property, easements, franchises and hereditaments. A vested right of action is property in the same sense that tangible things are property, and is equally protected against arbitrary interference by the prohibition of the Constitution. (*Pritchard v. Norton*, 106 U. S. 124, 27 L. Ed. 104, 1 S. Ct. 102.) For the same reason a water right under the common law is a vested property right.

The favorable finding for the plaintiff in the lower court on all issues established a diminution of $200 per acre in the value of the plaintiff's land by reason of the large withdrawals of underground water by the city of Wichita from the vicinity of the plaintiff's land. The plaintiff, however, sought to show that such damages were inadequate and requested injunctive relief.

Assuming the 1945 Water Appropriation Act to be constitutional, does the new cause of action entitle the common law claimant to recover damages, such as the plaintiff's evidence herein established to the satisfaction of the trial court? If so, has a Pandora's box of litigation been opened? What are the pitfalls? How can a landowner know which appropriator, where many permits have been issued, is causing the damage to his property? In many instances the landowner could not prove which appropriator or appropriators were causing his damage, any more than he could trace particles of water lying beneath the surface.

If the appropriator is the city of Wichita, for example, must the common law claimant comply with the provisions of G. S. 1961 Supp., 12-105, and is he limited in his cause of action to such damages as occur within three months prior to the filing of his

claim with the city? Must suit be brought in the county where the city is located when it is foreign to the landowner, so that the landowner is at the mercy of jurors into whose pockets the city may reach to pay any verdict returned in favor of the landowner?

In spite of the evidence in this case, the court says: *"If he [the plaintiff] thinks he has been damaged* by the pumping of the ten water supply wells in question, the Act gives him a right to commence a suit for such damage (82a-716, 721a)."* (Emphasis added.)

A great paradox is disclosed by reading *Power Co. v. Cement Co.,* 295 U. S. 142, 79 L. Ed. 1356, 55 S. Ct. 725. In discussing the Desert Land Act of 1877 it is there said that the appropriation doctrine in arid land states was necessitated because of the need for irrigating wide stretches of parched and barren land, which never could be made to produce agricultural crops, except by the transmission of water for long distances and its consumption in the process of irrigation. Necessarily, the need for irrigation in these states involved the complete subordination of the common law doctrine of riparian rights to that of appropriation. It became the determining factor in the long struggle to expunge from our vocabulary the legend "Great American Desert," which was spread in large letters across the face of the old maps of the Far West.

Here in Kansas, however, the court upholds an act which deprives owners of the garden lands of this state of the primary factor which makes them abundantly productive, subirrigation from ground waters, and it is done without any influence of the Desert Land Act of 1877 upon the prior development of Kansas law.

Fear to recognize a *private property right in common law claimants,* who have not applied water to a beneficial use prior to·the enactment of the 1945 Water Appropriation Act, bespeaks recognition of the numerous authorities construing the due process clause of the United States Constitution, which prohibits a state from enacting legislation which has the effect of taking one man's property and giving it to another. (*Thompson v. Consolidated Gas Co.,* 300 U. S. 55, 79, 80, 81 L. Ed. 510, 57 S. Ct. 364; *Loan Association v. Topeka,* 87 U. S. 655, 22 L. Ed. 455; *Fletcher v. Peck,* 10 U. S. 87, 3 L. Ed. 162; and *Chicago, Burlington &c. R'D v. Chicago,* 166 U. S. 226, 41 L. Ed. 979, 17 S. Ct. 581.)

There are acts which the federal or state legislature cannot do without exceeding their authority. They may not violate the right of private property. (*Calder v. Bull,* 3 U. S. 386, 1 L. Ed. 648.)

The United States Supreme Court, speaking through Justice Holmes in the case of *Penna Coal Co. v. Mahon*, 260 U. S. 393, 67 L. Ed 322, 43 S. Ct. 158, 28 A. L. R. 1321, said:

". . . In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders. . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. . . ." (p. 416.)

Once private property rights have attached, they cannot be subsequently invaded. (*Sturr v. Beck*, 133 U. S. 541, 551, 33 L. Ed. 761, 10 S. Ct. 350; and *Fletcher v. Peck*, supra.)

No legislature may constitutionally make any law disturbing or destroying existing or vested rights, whether such rights be statutory or embodied in judgments or judicial decisions; nor may a legislature so impair an existing remedy so as to destroy or materially impair such vested rights. (*Fletcher v. Peck*, supra; *Loan Association v. Topeka*, supra; *Poindexter v. Greenhow*, 114 U. S. 270, 29 L. Ed. 185, 5 S. Ct. 903; *Chicago, Burlington &c. R'D v. Chicago*, supra; and see 16A C. J. S., Constitutional Law, §§ 417 and 418, where the cases are accumulated.)

An exhaustive review and discussion of both the case and statutory law of Kansas was undertaken in *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571, concerning water and water rights. In the opinion the court said:

"From these statutes it will be observed that the diversion and appropriation of water to beneficial uses has been recognized to be a public use, and the right of eminent domain may be invoked for the purposes sought to be accomplished; but, manifestly, *proceedings under these statutes cannot operate to the destruction of previously vested common-law rights. Property in the flow of water acquired under the old system is protected by the constitution of the United States, and can be condemned for public uses only under the same restrictions as apply to the taking of other private property for public uses.* (*City of Emporia v. Soden*, supra [25 Kan. 588].) And other interpretation of the statutes would render them void." (p. 239.) (Emphasis added.)

*Clark v. Allaman*, supra, has been affirmed and cited with approval in *Weaver v. Beech Aircraft Corporation* [1956], 180 Kan. 224, 303 P. 2d 159.

The foregoing basic principles of our form of government were recognized and discussed in *Irrigation Co. v. Klein* [1901], 63 Kan. 484, 65 Pac. 684.

Kansas has not only recognized the common law doctrine of

"riparian rights" and ownership of underground water by judicial decision and statute, but has actively insisted upon them in its own behalf and on behalf of the landowners of Kansas. This is disclosed by the Kansas-Colorado litigation which persisted for many years. (*Kansas v. Colorado*, 185 U. S. 125, 46 L. Ed. 838, 22 S. Ct. 552; *Kansas v. Colorado*, 206 U. S. 46, 51 L. Ed. 956, 27 S. Ct. 655; and *Colorado v. Kansas*, 320 U. S. 383, 88 L. Ed. 116, 64 S. Ct. 176; and see Senate Concurrent Resolution No. 14, appearing as L. 1901, Ch. 425.) These decisions indicate without question the law of Kansas to be that common law water rights are vested property rights. In view of such history there can be no question that property rights to water in Kansas were fully and completely vested long prior to 1945.

In the case of *Dartmouth College v. Woodward*, 17 U. S. 518, 4 L. Ed. 629, titles to land constituting part of the public domain, acquired by grants under the provisions of existing laws by private persons, were said to be beyond the reach of legislative revocation.

What have other states, not covered by the Desert Land Act of 1877, done?

The Supreme Court of Wisconsin in *Water Power Cases*, 148 Wis. 124, 134 N. W. 330, held a legislative enactment somewhat similar to the 1945 Water Appropriation Act of Kansas void. The statute placed all water power of the state under the supervision of a commission which ultimately placed it in the state or municipality. Failure to provide for the acquisition of the rights of the riparian owner and compelling him to submit to the provisions of the Act were said to be invalid because it was a taking of private property without compensation and due process of law. In the opinion the court said:

". . . But such incorporeal riparian rights are not, as against the riparian owner, subject or subordinate to any salable or demisable right of the state, or to any claim of the state for compensation therefor, or to any grant of the state to a third person for the purpose of manufacturing or of using or selling water power. They may be taken for the latter uses when such uses are public, but only upon compensation. . . ." (p. 145.)

Further in the opinion it was said:

". . . If the legislature could, by mere fiat, make any use of property a public use, all private property could in this way be subjected to these drastic regulations justified by a public use. . . ." (p. 148.)

It is generally recognized that a *riparian right* to water in a stream is *property* which cannot be taken except for the public use and

upon the payment of just compensation. A statute declaring waters flowing in a natural channel public and subject to appropriation, so far as they are not being applied to a useful or beneficial purpose, or reasonably needed for such purpose, unconstitutionally deprives riparian owners of their property without due process of law. (See anno. 56 A. L. R. 264, and cases accumulated.)

The Supreme Court of South Dakota recognized the difference between "regulation" and "confiscation" in *Ditch Co. v. Ditch Co.,* 32 S. D. 260, 143 N. W. 124. It said:

". . . The right to use such waters cannot be thus confiscated or interfered with by the state or the public and placed in the custody and control of a state engineer any more than could the land itself upon which such water happened to be. . . ." (p. 267.)

Further in the opinion the court said a riparian right to use such waters of a flowing stream cannot be lost by disuse.

When the New York Court of Appeals in *Forbell v. City of New York,* 164 N. Y. 522, 58 N. E. 644, was confronted with subterranean waters similar to those of the Equus Beds, it recognized that the water supply of a great city was of much greater importance than the celery and water cresses of which the plaintiff's land was so productive before the defendant city encroached upon his water supply. But the court held the defendant could employ the right of eminent domain and thus provide its people with water without injustice to the plaintiff.

The Supreme Court of Michigan in *Schenk v. City of Ann Arbor,* 196 Mich. 75, 163 N. W. 109, said it was imperative that the people of the city have water, but that it was not imperative that they secure it at the expense of those owning lands adjoining lands owned by the city.

In 1917 the legislature gave recognition to the common law in Kansas and declared *"underground waters for all purposes to become appurtenant to the lands under which they flow."* (Emphasis added.) (L. 1917, Ch. 172, § 6[*d*].) This legislation had the effect of settling the *vested property* rights of landowners in the Equus Beds to the water underlying their land. The foregoing provision, appearing as G. S. 1935, 24-903(*d*), was on the statute books until the enactment of the 1945 Water Appropriation Act, when the revisor of statutes noted that it was transferred to G. S. 1949, 82a-707. Nowhere in the statutes of Kansas is such provision repealed, except by implication in the 1945 Water Appropriation

Act. A headnote following the title to the Act itself (L. 1945, Ch. 390) merely says G. S. 1935, 24-903, is amended.

It is respectfully submitted the 1945 Water Appropriation Act is unconstitutional and void. It is in contravention of the United States Constitution which forbids a state to deprive any person of life, liberty or property without due process of law, and to the substantial equivalent of the latter contained in the Kansas Constitution. The water underlying the plaintiff's land is appurtenant to the land, and the plaintiff's right thereto under Kansas law is a *common law vested property right* which the state has appropriated without giving compensation to the owner. Arbitrary power and the rule of the Constitution cannot both exist. (*Jones v. Securities Commission,* 298 U. S. 1, 24, 80 L. Ed. 1015, 56 S. Ct. 654.)

Any cause of action which accrued to the plaintiff for the taking of his property accrued on the date of the taking in 1945 when the enactment became law (*Hubbard v. Power Co.,* 89 Kan. 446, 131 Pac. 1182), and the attempt of the legislature to provide a cause of action against unknown parties at some future date is wholly inadequate (*Murrison v. Fenstermacher,* 166 Kan. 568, 203 P. 2d 160). *A fortiori,* a new cause of action which did not exist at the common law would be inadequate and ineffectual as a substitute for compensation.

My dissent in this case is directed solely to the issue upon which the court decided the case—the constitutionality of the 1945 Water Appropriation Act on the *federal issue* of due process.

The plaintiff in the lower court sought an injunction upon the theory that the ground water in the Equus Beds constituted an underground stream. He relied upon *Wallace v. City of Winfield,* 96 Kan. 35, 149 Pac. 693; and *City of Emporia v. Soden,* 25 Kan. 588, for the propositions that (1) injunction is a proper remedy when damages are continuous and would entail frequent and almost continuous litigation, and (2) that the diversion of water by a city for the purpose of selling it is not a riparian use and is not authorized.

Although the plaintiff prevailed in the lower court by a general finding of the trial court in his favor, the evidence presented by the record does not support a finding that the waters of the Equus Beds constitute an underground stream. Instead, the evidence establishes the underground water to be percolating. There is no evidence to the contrary. For this reason the plaintiff on the record here presented is not entitled to injunctive relief. The common

law relative to percolating ground water permits the city of Wichita at its own pleasure to pump the water from the ten well sites in question upon land under which the city has purchased the water rights. (*City of Emporia v. Soden,* supra, Syl. ¶ 3.)

As to percolating ground water the plaintiff made no attempt in the trial court to proceed on the theory that the common law of Kansas may have been modified by the "reasonable use" doctrine which had heretofore been applied to surface streams. (*Clark v. Allaman,* 71 Kan. 206, 80 Pac. 571.)

In result, I agree the judgment of the trial court must be reversed on the record here presented.